OPINIONS OF THE SUPREME COURT OF OHIO
        The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
        Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
        NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.


The State of Ohio, Appellant, v. Evans, Appellee.
[Cite as State v. Evans (1993),     Ohio St.3d    .]
Criminal law -- Actions permissible under Terry v. Ohio if
     police officer is unable to determine from pat-down search
     that suspect is not carrying a weapon.
1.  The driver of a motor vehicle may be subjected to a brief
        pat-down search for weapons where the detaining
        officer has a lawful reason to detain said driver in a
        patrol car.
2.  When an officer is conducting a lawful pat-down search for
        weapons and discovers an object on the suspect's
        person which the officer, through his or or her sense
        of touch, reasonably believes could be a weapon, the
        officer may seize the object as long as the search
        stays within the bounds of Terry v. Ohio (1968), 392
        U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.
        (No. 92-311 -- Submitted February 17, 1993 -- Decided
September 22, 1993.)
        Appeal from the Court of Appeals for Cuyahoga County, No.
59506.
        In the early morning hours of April 23, 1989, East
Cleveland Police Officers Carl Green and Jamie Travano were on
routine patrol when they observed a vehicle being driven
westbound on Glynn Road with one of its headlights burned out.
The officers flashed the cruiser's lights and stopped the
vehicle by a nearby intersection.  Both officers got out of the
patrol car and approached the vehicle, which they discovered
was being driven by the defendant-appellee, Dwayne Evans.
Officer Green advised defendant why he had been stopped and
asked that he produce his driver's license.  Defendant did not
have his driver's license.
        While questioning defendant in connection with the traffic
violation, the officers received a broadcast over their
portable radios.  Officer Green testified that they were
informed by the police dispatcher that a male wearing a red
jogging suit with "Reebok" written across the back "had just
made a drug transaction" and that he was believed to be driving
westbound on Glynn Road in a gray car.  In addition, Officer

Travano was able to recall at the suppression hearing that the dispatcher had stated that the car was a Datsun 280Z. The officers observed that defendant's clothing and car matched the description of the individual described in the radio broadcast. Officer Green testified that he did not know whether the tip had been given by an anonymous informant.

Officer Green, assisted by Officer Travano, asked defendant to step out of his car. While conducting a pat-down search of defendant's person, Officer Travano felt a large bulk in the left front pocket. Officer Travano placed his hand in this pocket and removed a large wad of money on top of which was a small packet of crack cocaine. Defendant was placed in the cruiser and arrested.

On June 5, 1989, defendant was indicted by the Cuyahoga County Grand Jury in a four-count indictment, to wit, three counts of drug violations (R.C. 2925.03 and 2925.13) and one count of possession of criminal tools (R.C. 2923.24). After defendant's motion to suppress evidence was denied by the trial court, defendant changed his previously entered pleas of not guilty to pleas of no contest. He was found guilty of all counts as charged in the indictment.

The court of appeals reversed defendant's convictions in a split decision, with one judge concurring in judgment only and one judge dissenting. The court of appeals held that the trial court erred in denying defendant's motion to suppress.

The cause is now before this court pursuant to the allowance of a motion for leave to appeal.

Stephanie Tubbs Jones, Cuyahoga County Prosecuting Attorney, and George J. Sadd, Assistant Prosecuting Attorney, for appellant.

Edward S. Wade, Jr., and James R. Willis, for appellee.

Moyer, C.J.    In determining whether defendant's constitutional rights were violated, we must consider two issues arising under the Fourth Amendment. First, having lawfully detained defendant for a traffic violation, did the police officers have the authority to conduct a pat-down search of defendant's body after ordering him out of his car? Second, if the officers had legal authority to search defendant, did they exceed the permissible scope of that pat-down search for weapons?

I

The propriety of the initial stop of defendant's vehicle cannot be reasonably disputed under the facts of this case. The officers' suppression hearing testimony, indicating that defendant was pulled over because of a burned-out headlight, is uncontroverted and served as the lawful basis for the stop. The focus of our inquiry, therefore, is on the officers' request that defendant step out of the vehicle and on the ensuing pat-down search for weapons.

The United States Supreme Court, in Pennsylvania v. Mimms (1977), 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331, held that a police officer may order a motorist to get out of a car, which has been properly stopped for a traffic violation, even without suspicion of criminal activity. What is now referred to as a "Mimms order" was viewed by the court as an incremental

intrusion into the driver's personal liberty which, when balanced against the officer's interest in protection against unexpected assault by the driver and against accidental injury from passing traffic, is reasonable under the Fourth Amendment.  In this regard, the court stated:

"*** We think this additional intrusion can only be described as de minimis.  The driver is being asked to expose to view very little more of his person than is already exposed.  The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it.  Not only is the insistence of the police on the latter choice not a 'serious intrusion upon the sanctity of the person,' but it hardly rises to the level of a '"petty indignity."'  Terry v. Ohio [(1968), 392 U.S. 1, 17, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889, 903].  What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety."  Pennsylvania v. Mimms, 434 U.S. at 111, 98 S.Ct. at 333, 54 L.Ed.2d at 337.

Other courts have relied on Mimms in holding constitutional a police officer's additional order that the driver be seated in the patrol car.  See State v. Mertz (N.D. 1985), 362 N.W.2d 410, 413, where the Supreme Court of North Dakota held that this "additional increment of intrusion" into a driver's personal liberty "does not outweigh public-policy concerns for the safety of police officers and in North Dakota, with its varying weather conditions, concerns for the protection of both the officer and driver."  See, also, United States v. Manbeck (C.A.4, 1984), 744 F.2d 360, 377-378.

Mimms merely dispenses with the requirement that the police officer possess reasonable suspicion of criminal activity before the officer may order the driver out of an already lawfully stopped vehicle.  Accordingly, the ordering of defendant to get out of his car was proper even if the officers were unable to articulate a reasonable suspicion which prompted this action.

Contrary to the lower court's opinion, the order to step out of the vehicle is not a stop separate and distinct from the original traffic stop.  It is so minimal and insignificant an intrusion that the Mimms court refused to apply the requirements for an investigatory stop.  Unlike an investigatory stop, where the police officer involved "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," Terry v. Ohio (1968), 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906, a Mimms order does not have to be justified by any constitutional quantum of suspicion.

We turn now to the propriety of a police officer's pat-down search for weapons -- a search governed by the dictates of Terry v. Ohio, supra.  Under Terry, a limited protective search of the detainee's person for concealed weapons is justified only when the officer has reasonably concluded that "the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others ***."  Id. at 24, 88 S.Ct. at 1881, 20 L.Ed.2d at 908.  Justice Harlan's concurring opinion in

Terry emphasizes that "the right to frisk must be immediate and automatic" where the lawfully stopped detainee is under suspicion for a crime of violence.  Id. at 33, 88 S.Ct. at 1886, 20 L.Ed.2d at 913.  "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence ***."  Adams v. Williams (1972), 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 617.  "Where a police officer, during an investigative stop, has a reasonable suspicion that an individual is armed based on the totality of the circumstances, the officer may initiate a protective search for the safety of himself and others."  State v. Bobo (1988), 37 Ohio St.3d 177, 524 N.E.2d 489, paragraph two of the syllabus.

A Mimms order does not automatically bestow upon the police officer the authority to conduct a pat-down search for weapons.  In analyzing the ensuing Terry frisk, the question we must ask is whether, based on the totality of the circumstances, the officers had a reasonable, objective basis for frisking defendant after ordering him out of the car.  See State v. Andrews (1991), 57 Ohio St.3d 86, 565 N.E.2d 1271. "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'"  Mimms, supra, 434 U.S. at 108-109, 98 S.Ct. at 332, 54 L.Ed.2d at 335, quoting Terry, supra, 392 U.S. at 19, 88 S.Ct. at 1878-1879, 20 L.Ed.2d at 904.

The transcript of the suppression hearing reveals that the officers' actions were motivated by two possible concerns: (1) the information received from the radio broadcast, and (2) the defendant's failure to properly identify himself by producing his driver's license.1  Officer Green agreed with defense counsel on cross-examination that the request to defendant to step out of the car and the frisk were the result of what he had heard from the police dispatcher.  On redirect, however, Officer Green stated that these actions were taken because defendant's inability to produce a driver's license meant that the officers had to place him in the back seat of the patrol car.  The apparent inconsistency was later clarified for the fact finder by Officer Green's testimony that both concerns prompted his actions.

Next to testify was Officer Travano.  According to his suppression hearing testimony, after defendant was ordered out of the car, he was patted down as an incident to his failure to produce a driver's license.  The officers wanted to run defendant's name through the computer to verify the existence of his driver's license as well as ascertain the car owner's identity.  Officer Travano further stated that the protective search was conducted because he wanted to be sure that defendant did not possess weapons while being detained in the patrol car.  Officer Travano stressed that defendant was searched on this basis alone.  The radio broadcast, according to his testimony, was not the motivating reason for either asking defendant to get out of his vehicle or the pat-down protective search for weapons.

We recognize that one of the realities of police work is that an officer's conduct is not always guided by a single objective.  An additional motive, later determined to be

improper, will not taint an otherwise lawful search.  Here, the officers' pat-down search of defendant was in accordance with standard police procedure which dictates that protective measures be taken before a person is to be held in the back seat of a squad car.  A determination as to the reasonableness of a particular police procedure depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." United States v. Brignoni-Ponce (1975), 422 U.S. 873, 878, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607, 614-615.  Certainly, it is reasonable that the officer, who has a legitimate reason to so detain that person, is interested in guarding against an ambush from the rear.  "A court reviewing the officer's actions must give due weight to his experience and training and view the evidence as it would be understood by those in law enforcement."  Andrews, supra, 57 Ohio St.3d at 88, 565 N.E.2d at 1273.

We, therefore, find that the police officers' proffered justification in patting down the driver -- their own personal security -- is legitimate.  When balanced against the driver's minimal privacy interests under these circumstances, we can only conclude that the driver of a motor vehicle may be subjected to a brief pat-down search for weapons where the detaining officer has a lawful reason to detain said driver in the patrol car.  Terry wisely instructs that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."  Terry, 392 U.S. at 23, 88 S.Ct. at 1881, 20 L.Ed.2d at 907.  The state's obligation not to violate the individual's Fourth Amendment rights does not command that the police officer forsake reasonable precautionary measures during the performance of his duties.

The court of appeals, however, held that the police officers' search of defendant's person was unlawful because their actions were motivated solely by what was relayed to them on the radio broadcast.  We disagree.  Officer Travano testified contrary to this position.  The testimony of Officer Green, while at times inconsistent, can hardly be interpreted with the court of appeals' degree of certainty.  It is well to note that only the trier of fact, who is in the unique position to observe a witness face-to-face, can make such factual inferences as elusive as the witnesses' subjective motives. According to one expert on communication techniques for trial attorneys, ninety percent of the total meaning of testimony is interpreted through nonverbal behavior, such as voice inflection, hand gestures, and the overall visual demeanor of the witness.  The witnesses' choice of words accounts for only ten percent of the meaning of their testimony.  Rasicot, New Techniques for Winning Jury Trials (1990) 28-29.  Therefore, nonverbal information, incapable of being transcribed into the record by the court stenographer, significantly influences the fact finder's determinations.  After reviewing the police officers' suppression hearing testimony, we find that the court of appeals' position cannot be maintained.  The record is simply not as unequivocal as the appellate court believed.

Alabama v. White (1990), 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301, heavily relied on by the court of appeals in

reversing defendant's conviction, presents facts bearing some resemblance to the facts of the case sub judice. Both cases concern a police officer's reliance on tips given by an anonymous informant involving drugs. However, unlike the case sub judice where defendant's car had already been lawfully stopped for a traffic violation, the anonymous tip in White formed the basis for stopping a car being driven by the defendant. In White, an anonymous individual phoned the police department and informed it that "Vanessa White" would be leaving a certain apartment at a particular time. She would be driving a brown Plymouth station wagon with a broken right taillight lens to a specific motel with about an ounce of cocaine in her possession. Police arrived at the designated apartment, observed a woman get in the station wagon, and then followed her as she drove the most direct route to the motel identified by the caller. Police stopped the vehicle just short of its destination and informed White that she had been stopped for suspected cocaine possession. After White consented to the search of the vehicle, the officers discovered cocaine and marijuana.

The issue in White was whether the anonymous tip exhibited sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop. In resolving this issue, the court applied the "totality of the circumstances" approach (which had been adopted as a test for probable cause in Illinois v. Gates [1983], 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527)2 to decisions involving the less demanding standard of reasonable suspicion. The court observed that, under the facts of the case, "significant aspects of the informer's predictions" had been independently corroborated by the police in the course of following the defendant. Alabama v. White, 496 U.S. at 332, 110 S.Ct. at 2417, 110 L.Ed.2d at 310. This "imparted some degree of reliability to the other allegations made by the caller." Id. The court observed that the anonymous informant's tip under this set of facts generated reasonable suspicion because the informant was able to accurately predict White's "future behavior."3 (Emphasis sic.) Id.

The court of appeals' reliance on White is misplaced. Initially, it is important to emphasize that the court in White did not depart from its well-established "totality of the circumstances" test. White does not establish a categorical rule conditioning a Terry stop (when police are acting on an anonymous tip) on corroboration of predictive information. The critical inquiry is more broadly focused on the existence of reasonable suspicion, as the following language from White indicates:

"Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors -- quantity and quality -- are considered in the 'totality of the circumstances -- the whole picture[.]'" White, 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 309.

Unlike the defendant in White, Evans was subjected to a stop because of a traffic violation. The police officers' testimony at the suppression hearing clearly reveals that they were authorized to stop defendant's car because they witnessed

him driving with only one operable headlight, a violation of R.C. 4513.04. Since the reason for the traffic stop was a violation of traffic laws, the court of appeals erred in finding White was the controlling authority.

Even if we were to draw the same factual inferences from the officers' suppression hearing testimony as did the court of appeals -- that the pat-down search was motivated solely by the information received by the radio broadcast -- we would conclude that a rational trier of fact could find that the officers had a reasonable suspicion to justify a Terry search. Here, a routine and innocuous stop for an equipment violation turned into a situation fraught with danger. While speaking to defendant in regard to the burned out headlight, both officers received a message over their portable radios that a person fitting defendant's description -- a male wearing a red Reebok jogging suit and driving westbound on Glynn Road in a gray Datsun 280Z -- had participated in a drug transaction. Being in close proximity to the officers, defendant may have even been alerted by this information. Because these details of the anonymous tip were corroborated by what the police officers had already observed, they were justified in suspecting that the remainder of the broadcast's information was accurate as well -- namely, that defendant had been involved in a drug deal. "[R]easonable suspicion can arise from information that is less reliable than that required to show probable cause." White, 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 309. In this regard, we observe that while this anonymous informant's tip may not provide a sufficient basis either to arrest or to stop a car lawfully driven, it is certainly reliable enough to justify a pat-down search for weapons. The right to frisk is virtually automatic when individuals are suspected of committing a crime, like drug trafficking, for which they are likely to be armed. See State v. Williams (1990), 51 Ohio St.3d 58, 554 N.E.2d 108. See, also, United States v. Ceballos (E.D.N.Y. 1989), 719 F.Supp. 119, 126: "The nature of narcotics trafficking today reasonably warrants the conclusion that a suspected dealer may be armed and dangerous."

The court of appeals' opinion implies that a critical factor in determining whether the officer had reasonable suspicion that the detainee was armed is whether the officer is in fear for his or her safety. We disagree. The following language from United States v. Tharpe (C.A.5, 1976), 536 F.2d 1098, is on point:

"We know of no legal requirement that a policeman must feel 'scared' by the threat of danger. Evidence that the officer was aware of sufficient specific facts as would suggest he was in danger satisfies the constitutional requirement. Terry cannot be read to condemn a pat-down search because it was made by an inarticulate policeman whose inartful courtroom testimony is embellished with assertions of bravado, so long as it is clear that he was aware of specific facts which would warrant a reasonable person to believe he was in danger. Under the familiar standard of the reasonable prudent man, no purpose related to the protective function of the Terry rule would be served by insisting on the retrospective incantation 'I was scared.'

"Some foolhardy policemen will never admit fear.

Conversely, reliance on such a litany is necessarily prone to self-serving rationalization by an officer after the fact. It would be all too easy for any officer to belatedly recite that he was scared in situations where he neither had any reason to be scared, nor was indeed scared. ***" United States v. Tharpe, supra, 536 F.2d at 1101, overruled on other grounds, United States v. Causey (C.A.5, 1987), 834 F.2d 1179.

Therefore, had the radio broadcast been the sole reason behind the officer's pat down of defendant, the limited search would have been lawful and evidence subsequently discovered would not be subject to the sanction of the exclusionary rule.

                                II

Our final task concerns the scope of the pat down conducted by the police. Because the court of appeals held that the officers did not have the authority to frisk defendant for weapons, it did not answer that question. As we have held the officers were entitled to pat down defendant for weapons, we must address this issue.

Under Terry and its progeny, the police may search only for weapons when conducting a pat down of the suspect. "A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. *** Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby ***." Terry, 392 U.S. at 25-26, 88 S.Ct. at 1882, 20 L.Ed.2d at 908. The protective pat down under Terry is limited in scope to this protective purpose and cannot be employed by the searching officer to search for evidence of crime.4 See Adams, supra, 407 U.S. at 146, 92 S.Ct. at 1923, 32 L.Ed.2d at 617. Obviously, once the officer determines from his sense of touch that an object is not a weapon, the pat-down frisk must stop. The officer, having satisfied himself or herself that the suspect has no weapon, is not justified in employing Terry as a pretext for a search for contraband. The specific question raised by the facts of this appeal concerns what future actions are permissible under Terry if the searching officer is unable to determine from the pat down that the suspect is not carrying a weapon.5

In answering this question, it is important first to emphasize that Terry does not require that the officer be absolutely convinced that the object he feels is a weapon before grounds exist to remove the object. At the same time, a hunch or inarticulable suspicion that the object is a weapon of some sort will not provide a sufficient basis to uphold a further intrusion into the clothing of a suspect. When an officer removes an object that is not a weapon, the proper question to ask is whether that officer reasonably believed, due to the object's "size or density," that it could be a weapon. 3 LaFave, Search and Seizure (2 Ed. 1987) 521, Section 9.4(c).

"Under the better view, then, a search is not permissible when the object felt is soft in nature. If the object felt is hard, then the question is whether its 'size or density' is such that it might be a weapon. But because 'weapons are not always of an easily discernible shape,' it is not inevitably essential that the officer feel the outline of a pistol or

something of that nature.  Somewhat more leeway must be allowed upon 'the feeling of a hard object of substantial size, the precise shape or nature of which is not discernible through outer clothing,' which is most likely to occur when the suspect is wearing heavy clothing."  (Footnotes omitted.)  Id. at 523.

Officer Travano testified that, upon patting down defendant, he discovered a "large bulk" in the left front pocket which "felt like a rock substance."  The following dialogue occurred between the officer and the defense attorney on cross-examination:

"Q. There was no question there wasn't a weapon?

"A. At the time, to be honest with you, I didn't know due to the fact of the big wad because he had like a thousand some dollars on him all in the same pocket.

"Q. But what I am saying is, when you felt his pocket, you knew it wasn't a gun, didn't you?

"A. Yes, I knew it wasn't a gun.

"Q. And it would be accurate to say you knew it wasn't a knife?

"A. I couldn't say that because I've seen knives come in all shapes and sizes."

We conclude that Officer Travano acted within the scope of Terry in reaching into defendant's pocket to retrieve the object because it was reasonable for him to believe the object could be a weapon.  Here, through his sense of touch as well as his experience on the police force, Officer Travano was unable to conclude that the object was not a knife or other weapon. "If by touch the officer remains uncertain as to whether the article producing the bulge might be a weapon, he is entitled to remove it."  United States v. Oates (C.A.2, 1977), 560 F.2d 45, 62 (removal of an overstuffed wallet justified when the officer could not determine what caused the bulge by feeling it through defendant's outer clothing).  Accordingly, we hold that when an officer is conducting a lawful pat-down search for weapons and discovers an object on the suspect's person which the officer, through his or her sense of touch, reasonably believes could be a weapon, the officer may seize the object as long as the search stays within the bounds of Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.  In this case, what later was discovered to be a large wad of money and a little packet of crack cocaine was of such size and density that a reasonable officer could not discount the possibility that it was a weapon.  Officer Travano stayed within the proper bounds of a Terry-type search.

Our holding today does not authorize the removal of a soft object that the officer knows or reasonably should know is not itself a weapon on the grounds that it may contain a small weapon such as a razor blade.  "'[S]omething of the size and flexibility of a razor blade could be concealed virtually anywhere, and accordingly provide the pretext for any search, however thorough.'"  (Footnote omitted.)  3 LaFave, Search and Seizure (2 Ed. 1987) 522, Section 9.4(c).  Such a police procedure would, therefore, be impermissible under Terry because it would be tantamount to allowing the more intrusive search incident to custodial arrest to be made without reasonable grounds to arrest.

For the foregoing reasons, we reverse the judgment of the

court of appeals and remand the cause to the trial court for reimposition and execution of the original sentence.

                                    Judgment reversed
                                    and cause remanded.

Douglas, Resnick and F.E. Sweeney, JJ., concur.
A.W. Sweeney, Wright and Pfeifer, JJ., dissent.

FOOTNOTES:

1 Pursuant to R.C. 4507.35, police have the authority to request a driver of a lawfully stopped motor vehicle to display a driver's license or furnish satisfactory proof that he or she has such license. The provision also states that "[f]ailure to furnish satisfactory evidence that such person is licensed under sections 4507.01 to 4507.30 of the Revised Code, when such person does not have his license on or about his person shall be prima-facie evidence of his not having obtained such license."

Violation of R.C. 4507.35 is currently punishable under R.C. 4507.99(F) as a misdemeanor of the first degree. Although an issuance of a citation for a minor misdemeanor is the general rule, R.C. 2935.26(A) explicitly authorizes the police officer to make an arrest under certain exceptional circumstances. One such circumstance, R.C. 2935.26(A)(2), occurs when the offender cannot or will not produce a satisfactory form of identification.

2 Gates applied the "totality of the circumstances" approach to determine whether an informant's tip established probable cause for the issuance of a search warrant. In abandoning the "two-pronged test" of Aguilar v. Texas (1964), 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, and Spinelli v. United States (1969), 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637, the United States Supreme Court, in Gates, nonetheless emphasized that the informant's "veracity," "reliability," and "basis of knowledge" remain "highly relevant" in probable cause determinations. Gates, 462 U.S. at 230, 103 S.Ct. at 2328, 76 L.Ed.2d at 543.

3 "*** What was important was the caller's ability to predict respondent's future behavior, because it demonstrated inside information -- a special familiarity with respondent's affairs. The general public would have had no way of knowing that respondent would shortly leave the building, get in the described car, and drive the most direct route to Dobey's Motel. Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities. See [Illinois v. Gates, supra, 462 U.S.] at 245, 103 S.Ct. at 2336, 76 L.Ed.2d at 552-553. When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop." (Emphasis sic.) White, supra, 496 U.S. at 332, 110 S.Ct. at 2417, 110 L.Ed.2d at 310.

4 "Terry states:

"Suffice it to note that such a search, unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of

evidence of crime.  See Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777, 780 (1964).  The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."  392 U.S. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 910-911.

5 We are aware of Minnesota v. Dickerson (1993),     U.S.    , 113 S.Ct. 2130,     L.Ed.2d    , recently decided by the United States Supreme Court.  While Dickerson and the case at bar both involve the reliability of the sense of touch of a police officer conducting a protective pat-down search, that is where the similarity ends.  Dickerson answered the question whether police may enter a suspect's pockets during the course of a Terry pat down on the basis of something other than a belief that the individual is carrying a weapon.  Drawing an analogy to the plain view doctrine, the court held that police, conducting a lawful Terry-type search, may seize nonthreatening contraband when its incriminating nature is "immediately apparent" to the searching officer through his sense of touch.  Id. at    , 113 S.Ct. at    ,     L.Ed.2d at 345.  In other words, the officer may not manipulate the object, which he has previously determined not to be a weapon, in order to ascertain its incriminating nature.  This limitation on the "plain feel" exception to the warrant requirement of the Fourth Amendment ensures that police will search only within the narrow parameters allowed for a Terry-type search.

Dickerson has no relevance to circumstances, like the ones brought before our court, where personal safety is the reason behind the officer's entering the suspect's pocket.  Operating under a reasonable belief that the object was a weapon, Officer Travano retrieved the large wad of money and packet of crack cocaine from the defendant's pocket.  Therefore, since Officer Travano removed this object in order to protect himself, the seizure cannot be struck down under Dickerson.

Wright, J., dissenting.    I must respectfully dissent because the majority's analysis fails in two critical, interrelated respects.  First, it is apparent from the testimony of the officers that they did not have a reasonable belief there was a weapon in Evans's left front pocket.  Thus, the search of the interior of the pocket and the subsequent seizure of a small amount of cocaine went beyond the constitutional limits set by Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

Second, and more important, the record is clear that the officer pressed beyond the limits of a Terry search when he put his hand into Evans's pocket and removed the contents because of his suspicion that the pocket contained drugs, not a weapon.  Therefore, the constitutionality of the search of the interior of the pocket must be analyzed in light of the United States Supreme Court's very recent ruling in Minnesota v. Dickerson (1993), 508 U.S.    , 113 S.Ct. 2130, 124 L.Ed.2d 334.  In Dickerson, the court held that an officer must have probable cause, not just reasonable suspicion, to extend a Terry pat-down search for weapons into a search for

contraband.  I believe that Dickerson is dispositive of this matter, yet the majority relegates Dickerson to a footnote.  A full analysis of Dickerson is contained infra.

I

The majority bases its decision on Terry and its progeny. There are three steps to a Terry analysis.  First, to justify the investigatory stop the officer must have a reasonable suspicion that "criminal activity may be afoot."  Terry, 392 U.S. at 30, 88 S.Ct. at 1884, 20 L.Ed.2d at 911.  Next, if the officer reasonably believes the person "may be armed and presently dangerous," the officer may engage in a limited frisk comprised of a pat down of the person's outer clothing to discern whether the person is carrying a gun or other weapon so that the officer may proceed with the investigation without fear for the officer's safety.  Id. at 30, 88 S.Ct. at 1884-1885, 20 L.Ed.2d at 911.  Finally, the officer is permitted to proceed beyond this limited pat down of the outer clothing of the detained person only if the officer has a reasonable belief that the object he or she is reaching for is a weapon.[6]  The determination of whether the officer's belief is reasonable is an objective, not subjective, test.  Id. at 21-22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906; State v. Williams (1990), 51 Ohio St.3d 58, 60, 554 N.E.2d 108, 111.  In other words the mere incantation of the magic words "I believed the object was a weapon" is not enough to make a warrantless search constitutional.

Applying the three steps of a Terry search to the present case, I agree with the majority that the initial stop for the broken headlight was permissible.  However, I believe that there is support for the conclusion by the court of appeals that the officers never had a reasonable belief that Evans was armed and, thus, a pat-down search was inappropriate.  I reach this conclusion based on a number of points raised by the majority, with which I agree.  I agree that "[a] Mimms order does not automatically bestow upon the police officer the authority to conduct a pat-down search for weapons" and the officers must have "a reasonable, objective basis for frisking defendant." (Emphasis added.)  All must agree that Terry requires that the officer reasonably conclude that "the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others ***."  Id., 392 U.S. at 24, 88 S.Ct. at 1881, 20 L.Ed.2d at 908.  The majority correctly notes that we have stated that an officer must have "a reasonable suspicion that an individual is armed based on the totality of the circumstances ***."  State v. Bobo (1988), 37 Ohio St.3d 177, 524 N.E.2d 489, paragraph two of the syllabus.  But be that as it may, these proper statements of the law do not lead the majority to a correct conclusion in this case.  Surprisingly, the majority points to no evidence that the officers had an objectively reasonable belief that Evans was armed.[7]

This leads me to conclude, as did the court of appeals, that the real motivation for the search was the radio broadcast and the real purpose of the search was to look for drugs.  The majority appears to misunderstand or ignore the full significance of the radio broadcast and its effect on the actions of the police officers, a significance which Judge

Harper understood full well in her opinion for the court of appeals.  One can debate whether the radio broadcast was the real reason for the Terry pat-down search or whether the reason somehow involved a routine police procedure to frisk Evans before placing him in the back of the police car while the officers ran a computer check on his license and car registration.  One can, perhaps, debate whether the radio broadcast, following a lawful stop, permitted a Terry pat-down frisk.

What cannot be debated, however, is the fact that the radio broadcast, referring to an alleged drug transaction, affected the officers' actions concerning the extent of the search of Evans.  This can be seen from the testimony of both of the police officers.  Officer Green testified that the real reason for the search was the radio broadcast.  Officer Travano stated that he conducted an extended search because of the radio broadcast's reference to drugs.

Officer Green testified concerning police practice with regard to persons who have been stopped on minor traffic violations:

"Q.  They don't arrest on that?

"A.  No.

"Q.  You don't take people out of the car and search them for that also, do you?

"A.  No.

"Q.  And the sole purpose of taking him out of the car and frisking him was based on the alleged information you received from the radio broadcast, correct?

"A.  Yes.

"***

"Q.  Would it be safe to say, but for the radio broadcast, you would have never taken him out of the car, out of the car and patted him down.  That would be accurate, wouldn't it?

"A.  Correct."  (Emphasis added.)

After this testimony during cross-examination, on redirect Officer Green testified that the reason he initially asked Evans to get out of the car was because Evans did not have his driver's license and that he would have searched him for this reason also.  The trial court made its own inquiry to clarify the officer's testimony:

"Q.  The question, Officer, is what was the reason on this very occasion that you did conduct the search on the gentleman.

"A.  On this particular occasion the reason he was searched, it was due to the radio broadcast."  (Emphasis added.)

Officer Travano repeatedly testified that he intended to conduct a more extensive search than a Terry pat-down frisk because of the radio broadcast.  In reality, Officer Travano intended to conduct two searches:  one, a  Terry pat-down frisk for weapons which he justified on the basis that Evans would be placed in the back of the police vehicle while the officers ran a computer check on his license and car registration and, two, a more extensive search for contraband because of the information contained in the radio broadcast.  Officer Travano testified:

"A.  Before we put anybody in the police car, we do a weapon search.

"Q. Do you do a search for anything else?

"A. If our call is like -- depending on the call. If it is drug related, the search could possibly be more extensive due to the fact we checked the back seat of the police car before and after we put somebody in.

"So if the call came over that narcotics were involved or any kind of contraband, there would be a more, you know, search I would say."

In a series of questions to Travano by the prosecutor concerning the practice of detaining persons who do not have a driver's license with them, the prosecutor asked:

"Q. *** Would you normally search that person?

"A. Yes.

"Q. And the purpose of doing that, would it be necessarily for a weapon?

"A. Yes.

"Q. Would it be for anything else?

"A. Like I stated, depending on the call. You know, especially if there's contraband possibly involved.

"Q. In this particular instance, was there an indication of contraband being involved?

"A. By the radio broadcast, yes. It gave us reason to believe that this male possibly had some contraband on his person." (Emphasis added.)

Subsequently, in response to questions from defense counsel, Travano testified:

"Q. Now, you also said that at certain times you do more extensive searches than others.

"A. Yes. Right. Right, based on the probable cause and plus the radio broadcast. Our suspicion.

"Q. Your suspicion?

"A. Right.

"Q. And the radio broadcast?

"A. Yes." (Emphasis added.)

Although Officer Travano denied that the radio broadcast "triggered" the search, it is apparent that the radio broadcast affected the scope of the search. Travano intended to engage in an extended search for the purpose of finding contraband. But Terry permits only a "strictly circumscribed" search, id., 392 U.S. at 25, 88 S.Ct. at 1882, 20 L.Ed.2d at 908, the purpose of which "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence ***." Adams v. Williams (1972), 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 617.

Officer Travano's testimony describing the actual search confirms that he went into Evans's pocket not because he had a reasonable belief there was a weapon in the pocket, but because he suspected there were drugs in the pocket. To reach its contrary conclusion, the majority resorts to a selective editing of the actual testimony. The majority appears to distort the testimony when it states that the officer "upon patting down defendant, [Officer Travano] discovered a 'large bulk' in the left front pocket which 'felt like a rock substance.'" The actual testimony of the officer was: "Upon patting down the defendant over there, there was a large bulk in his pocket. While feeling the left front pocket, it felt like a rock substance might be in his pocket. That is when I

dug in his pocket and I pulled out a large wad of money.  On top of that was a little packet which was a white substance believed to be crack cocaine."  The officer never testified, as the majority states, that the large bulk felt like a rock substance.  Instead, it is apparent from the officer's testimony that he is describing two separate items: a large bulk and a rock substance.  We also know from the officer's testimony that the large bulk was money.  A wad of money is a soft object.  The majority states a rule it chooses not to follow: "'Under the better view, then, a search is not permissible when the object felt is soft in nature.'"  The second object, the rock substance, we know from the officer's testimony was a little packet believed to be crack cocaine.8  Again, according to the majority's own rule, "'[i]f the object felt is hard, then the question is whether its "size or density" is such that it might be a weapon.'"  It is not objectively reasonable to believe, as Terry and its progeny require, that a little packet of rock substance might be a weapon.  The purpose of Terry is to protect the officer from danger.  Not even the majority can suggest that the officers were in danger from an object so small.

Despite the majority's statement that "[o]ur holding today does not authorize the removal of a soft object that the officer knows or reasonably should know is not itself a weapon on the grounds that it may contain a small weapon such as a razor blade," that is indeed what the majority has done.9

                              II

Since the officer's intrusion into Evans's pocket was not justified under Terry as a pat-down search for weapons, it remains to determine whether it was justified under the "plain feel" exception recognized by the United States Supreme Court in Dickerson.  Because of its direct relevance to the disposition of this case, as stated above, I will discuss Dickerson in some detail.

In Dickerson, the Minnesota Supreme Court had ruled that the seizure of a small packet of cocaine from the defendant's pocket during a Terry pat-down search was unconstitutional for two reaons:  First, the court refused to recognize a "plain feel" exception to the warrant requirement of the Fourth Amendment and, second, even if such an exception existed, the intrusion into the defendant's pocket was outside the permissible scope of Terry.  The United States Supreme Court affirmed the judgment of the Minnesota Supreme Court.  The court disagreed with the Minnesota Supreme Court concerning recognition of a plain feel exception, but agreed that the search exceeded the limits of Terry and was therefore unconstitutional.

In rendering its decision, the Supreme Court again reviewed the requirements of Terry and its progeny.  The court stated:

"Time and again, this Court has observed that searches and seizures '"'conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well delineated exceptions.'"'  One such exception was recognized in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889(1968), which

held that 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions.

"Terry further held that '[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.'  'The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence ***.' Rather, a protective search -- permitted without a warrant and on the basis of reasonable suspicion less than probable cause -- must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'  If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed." (Emphasis added and citations omitted.)  Dickerson, 508 U.S. at    , 113 S.Ct. at 2135-2136, 124 L.Ed.2d at 343-344.

The Supreme Court then considered whether a plain feel exception could be analogized to the plain view exception. Under the plain view exception, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. *** If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object -- i.e., if 'its incriminating character [is not] "immediately apparent,"' *** -- the plain-view doctrine cannot justify its seizure." (Citations omitted.)  Id. at    , 113 S.Ct. at 2136-2137, 124 L.Ed.2d at 345.

The court found that there was an analogy between the plain view doctrine and "cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search."  Id. at    , 113 S.Ct. at 2137, 124 L.Ed.2d at 345.  Just as with the plain view doctrine, the object's identity must be "immediately apparent."  "[T]he Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures."  Id.

The court then applied the above principles to the facts in Dickerson.  The court found that "the dispositive question before this Court is whether the officer who conducted the search was acting within the lawful bounds marked by Terry at the time he gained probable cause to believe that the lump in respondent's jacket was contraband."  Dickerson at    , 113 S.Ct. at 2138, 124 L.Ed.2d at 347.  The court agreed with the Minnesota Supreme Court that the officer "overstepped the bounds of the 'strictly circumscribed' search for weapons allowed under Terry.  *** Where, as here, 'an officer who is executing a valid search for one item seizes a different item,' this Court rightly 'has been sensitive to the danger ... that

officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will.' *** [The search] therefore amounted to the sort of evidentiary search that Terry expressly refused to authorize, *** and that we have condemned in subsequent cases." (Citations omitted.) Dickerson at     , 113 S.Ct. at 2138-2139, 124 L.Ed.2d at 347-348.  This clear-cut holding is why I must offer my vigorous dissent in this case.

The Supreme Court's conclusion in Dickerson requires that we also find that the search into Evans's pocket was outside the strictly circumscribed limits of a Terry search.  "Although the officer [in Dickerson] was lawfully in a position to feel the lump in respondent's pocket, because Terry entitled him to place his hands upon respondent's jacket, the court below determined that the incriminating character of the object was not immediately apparent to him.  Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by Terry or by any other exception to the warrant requirement.  Because this further search of respondent's pocket was constitutionally invalid, the seizure of the cocaine that followed is likewise unconstitutional."  Dickerson at     , 113 S.Ct. at 2139, 124 L.Ed.2d at 348.

There is no testimony in this case that when the officer patted down Evans's front pocket it was "immmediately apparent" to him that either the soft wad or small rock substance items were drugs.  The state must carry the burden of proof to show that the warrantless search and seizure were constitutionally permissible.  Xenia v. Wallace (1988), 37 Ohio St.3d 216, 524 N.E.2d 889, paragraph two of the syllabus.  The officer had only a "suspicion" that the items in the pocket were contraband; he did not have probable cause to believe that the items were contraband.  Therefore, under Dickerson, the intrusion into the pocket was unconstitutional as was the subsequent seizure of the cocaine.

I fear that today's decision will cause the lower courts to grievously misapply  -- or, worse yet, feel no need to apply -- Dickerson.  A majority of this court evidently does not understand that the plain feel exception, like the plain view exception, requires probable cause.  This is an error that the United States Supreme Court must quickly correct, lest the plain feel exception devour the probable cause rule.

Had I been in the majority I would have engaged in an independent analysis of the Ohio Constitution to determine whether our state Constitution would permit a plain feel exception.  This decision particularly troubles me because other state supreme courts are analyzing their state constitutions and finding protections greater than the protections afforded under the United States Constitution. With this decision, the majority is not affording Ohio citizens even those rights which the United States Supreme Court recognizes under the United States Constitution.  As Justice A. W. Sweeney said in his dissenting opinion in State v. Smith (1989), 45 Ohio St.3d 255, 268, 544 N.E.2d 239, 250, reversed (1990), 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464:

"While we as a society must endeavor to deal with the scourge of illegal drugs in a quick and effective manner, we

must never sanction a solution that dispenses with the constitutional guarantees and personal liberties that have made ours the most enduring government on the face of the Earth."

For all these reasons, I would affirm the judgment of the court of appeals.

A.W. Sweeney and Pfeifer, JJ., concur in the foregoing dissenting opinion.

FOOTNOTES:

6  For a discussion of the application of this standard, see 3 LaFave, Search and Seizure (2 Ed. 1987) 521, Section 9.4(C), and Katz, Ohio Arrest, Search and Seizure (3 Ed. 1992) 244, Section 14.04.  The majority recognizes this standard in paragraph two of the syllabus.

7  The majority justifies the search on two separate, independent grounds: (1) police procedure to frisk individuals for weapons prior to placing them in the back seat of the cruiser, and (2) the radio broadcast description of a person who had allegedly engaged in a drug transaction.

The majority focuses on the proffered policy of frisking suspects before placing them in the rear seat of the cruiser. This may be a reasonable police procedure, but the majority does not analyze whether it was reasonable to place Evans in the back of the cruiser while checking for a valid driver's license.  I would conclude the officers did not need to place Evans in the cruiser during such a check.  As indicated by Officer Green's testimony, the officers did not actually consider Evans to be a threat while in his own car.  Officer Green testified that Evans "didn't do anything to make me feel afraid of him, no."  Moreover, there were two officers present.  One officer could have stayed with Evans while the other officer went to the cruiser to obtain the information they sought.  Such a check would, and apparently did, reveal that Evans did in fact have a valid driver's license.

With regard to the second purported justification for the search, contrary to the conclusion of the majority, the radio broadcast did not provide the officers with the requisite reasonable belief that Evans was armed and dangerous so as to justify the search.  The information available to the officers from the broadcast and from their own observations distinguishes this case from Alabama v. White (1990), 496 U.S. 325, 110 S.Ct. 2412, 100 L.Ed.2d 301.  In White, the information relayed in a telephone tip provided more details concerning the defendant's conduct than the radio broadcast in this case.  Even if the radio broadcast justified detaining Evans it did not provide the officers with any reasonable belief that Evans was armed and dangerous.  What the majority fails to emphasize about White is that the defendant in that case consented to the search after she was stopped by the police, which certainly is not the case here.

8  Officer Green agreed that it was "a very small amount" of cocaine.

9  This is the very type of justification proffered by the police officer in this case.  Officer Travano testified he knew the object was not a gun but did not know whether or not it was a knife "because I've seen knives come in all shapes and sizes."  A blanket statement such as this, that anything could

be a knife, does not meet the objective requirement that the officer have a reasonable belief the item could be a weapon. Acceptance of such a justification destroys even the illusion that there are constitutional limits to a Terry pat-down search.