OPINION
Defendant-appellant Rebecca Lander appeals from her conviction and sentence, following a no-contest plea, upon one count of Drug Abuse. Lander contends that the trial court erred when it denied her motion to suppress evidence upon the ground that it was unlawfully seized. We agree. Accordingly, the judgment of the trial court is Reversed, and this cause IsRemanded for further proceedings.
 I
Lander was a passenger in the car she owned when it was the subject of a traffic stop, for failure to signal a turn. Both Lander and the driver were observed not to be wearing seatbelts, and it was the purpose of the officers making the stop to cite each of them for a seatbelt violation, as well as to cite the driver for the improper turn.
The stop was not effectuated until the car was being parked. Lander and the driver both emerged from the car; one police officer gave his attention to the driver; the other, David House, gave his attention to Lander. Lander was walking toward a residence adjacent to the parked car. What happened thereafter was the subject of House's testimony, as follows:
 Q. And as the defendant was approaching 58 Drake, what did you do?
 A. I immediately had exited my cruiser. And I yelled to her, I believe, "Hold up," for the purpose of being — as well as we're behind the vehicle initially, we observed both individuals, which being Mr. Elvin Catlett (phonetic), who was the driver of the vehicle, and Miss Rebecca Lander, who was a passenger, neither of which was wearing seat belts. We then had the additional traffic violation of fail to signal at Main and Drake. I asked Miss Lander to hold up so I could issue her a citation for seat belt.
 Q. When you initially said, "Hold up," did the defendant comply?
 A. No, she kept walking toward the front porch of the house. And I believe she turned back and said, "Why?"
Q. Like she was asking you a question, "Why?"
A. She continued to walk as she did so.
Q. What did you do after she made that statement?
 A. I believe I started — I quickened my pace. And I again asked her to hold up. At this point in time, she turned around toward me, actually stopping, turned toward me, and immediately shoved her left hand into her lower left coat pocket.
 Q. Could you describe the coat the defendant was wearing that evening?
 A. It was a — I believe it was a wool type, almost sort of a semi-dress coat. It was a green three-quarter length. It had two lower pockets just below like the waist area. And I believe an upper breast pocket on the left side.
 Q. And you testified that she placed her left hand into the left coat pocket.
A. Yes, the lower left coat pocket.
Q. How far away from you — strike that.
How far away was she from you when she did that?
 A. At this point in time, I would say probably between 10 to 15 feet as I was walking toward her.
 Q. Okay. And when the defendant placed her hand in her pocket, did that cause you any concern?
 A. Yes, it did. As she shoved her hand in her pocket, not only did she stick her hand in her pocket, but I could see her actually appear to be digging down toward the bottom of the pocket with her hand. I could see her fingers moving through the material of the coat.
 I immediately asked her to remove her hand from the pocket. She did not. She kept digging around in the pocket.
 At that point in time, I closed the distance between us to where, not knowing what she's trying to pull out or when, a knife, a razor, even possibly a small handgun from the pocket, I didn't want her to simply pull it out on me. I actually took hold of her wrist and secured her hand into the pocket.
 Q. When the defendant's hand was in this left coat pocket, could you see any part of her hand?
A. No, I could not.
Q. So basically her whole hand was inside this pocket?
A. The — yes, it was.
 Q. And when you say you secured her wrist, how did you do that?
 A. I actually took hold of her wrist and held it in place to where she could not pull it out of the pocket.
* * * *
 Q. Okay. And did you ask her to do anything after you did that?
 A. Yes, as I took hold of her wrist, I could feel her hand was clenched in a fist as if she was holding something. And I ordered Miss Lander to release her fist to open her hand. She held on momentarily.
 I asked her again to open her hand, at which time I could feel her open her hand and release her fingers. Actually opening her fingers.
 Q. And after you felt the defendant do that, what did you do?
 A. I continued to hold onto her wrist so that I could control her hand, and I slowly lifted it out of her pocket.
 Q. After you lifted the defendant's hand out of her pocket, did you see anything inside her hand?
A. No. Her hand was open as it came out of the pocket.
Q. And then what did you do?
 A. Obviously believing there was something inside the pocket, possibly a weapon, that she was trying to retrieve, I did a patdown on the — on the pocket to ensure there was not a weapon there. That was the first area that I checked was that pocket.
Q. How did you do this patdown?
 A. I just did a simple patdown of her coat by pressing my hand against the coat and pressing against her leg.
 Q. And after you did that, did you detect anything in the pocket?
 A. I could feel a small, hard object in the lower corner of the pocket.
 Q. Now, as a member of the strike force, you've performed arrests for possession of drugs. Is that right?
A. Yes, I have.
Q. And you've had experience seeing crack cocaine?
A. Yes.
 Q. How many arrests would you say you've made while you've been on the strike force for possession of crack cocaine?
 A. While I've been on the strike force, a few hundred. Previous to being on strike force, I was on the fifth district bicycle patrol at which time — I did that for approximately four years — I would say I made a minimum five to 700 arrests for crack cocaine over that time period.
 Q. And when you placed your hand against the pocket, what did you immediately think was in the pocket?
 A. Well, from the feel and the size of the object, I immediately suspected it to be a single piece of crack cocaine.
Q. After you had determined that, what did you do?
 A. Miss Lander, once she had removed her hand from the pocket, had pretty much just seemed to — I don't know how I could say this. I wouldn't say had given up, but she basically just stood there almost — in a daze. She didn't say anything. She didn't move.
 So I didn't feel she was a threat of anything else at that point in time. So I just reached into the pocket to recover the object that I suspected to be crack cocaine. I removed that, and it did turn out to be one piece of crack cocaine.
(Emphasis added.)
A field test of the suspected crack cocaine was positive. Lander was arrested and charged with Drug Abuse.
Lander moved to suppress the evidence, contending that it was unlawfully obtained. Following a hearing, the trial court denied her motion to suppress. Thereafter, she pled no contest, was found guilty, and was sentenced accordingly.
From her conviction and sentence, Lander appeals.
 II
Lander's sole Assignment of Error is as follows:
 THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS THE EVIDENCE RECOVERED AS A RESULT OF THE ILLEGAL SEIZURE AND SEARCH OF DEFENDANT.
We are not persuaded by Lander's argument, in support of her assignment of error, that Officer House lacked probable cause to pat her down for weapons. There was testimony that the location was one in which a lot of drug-related and other crimes had been detected, and Lander's failure to comply with House's order to stop, coupled with the observed movement of her hand into her coat pocket, gave rise, in our view, to a reasonable conclusion that she might be armed, justifying the minimal intrusion represented by a weapons pat-down.
The State contends that once the officer felt the piece of crack cocaine in Lander's coat pocket, he was entitled to seize it, relying upon the plain-feel exception to the warrant requirement recognized in Minnesota v. Dickerson (1993),508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334. The State also relies onState v. Evans (1993), 67 Ohio St.3d 405, 618 N.E.2d 162. InState v. Evans, supra, the Ohio Supreme Court was concerned with a situation in which the officer, having conducted a pat-down frisk for weapons, could not determine whether the object felt during the pat-down frisk was a weapon. The court held "that [the police officer] acted within the scope of Terry [v. Ohio (1968,392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889,] in reaching into defendant's pocket to retrieve the object because it wasreasonable for him to believe the object to be a weapon." Id., at 415, (emphasis added).
In the case before us, unlike in State v. Evans, supra, the police officer conducting the pat-down appeared to have excluded the possibility that the object he felt was a weapon. He specifically testified that he "didn't feel she was a threat of anything else at that point in time."
Nevertheless, a police officer conducting a pat-down frisk for weapons is permitted to retrieve any contraband that he feels during the course of the frisk, as long as its nature as contraband is immediately apparent through the officer's sense of touch. Minnesota v. Dickerson, supra. This principle is derived by analogy from the plain-view doctrine that a police officer is not required to obtain a search warrant, but may immediately seize contraband within the officer's plain view during an otherwise lawful search. The incriminating character of the object must be immediately apparent. One might be tempted to conclude, therefore, that more than probable cause to believe that the object is contraband is required to invoke the plain-feel doctrine. However, the United States Supreme Court, in Minnesota v. Dickerson,
appeared to approve seizures based upon probable cause when it declared:
 Regardless of whether the officer detects the contraband by sight or by touch, however, the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against successfully speculative seizures.
Id., at 376.
For purposes of analysis, therefore, we will assume that an object coming within a police officer's plain feel during a proper pat-down frisk for weapons may be seized if the officer has probable cause to believe that the item is contraband before seizing it. In the case before us, Officer House testified that he could feel a small, hard object in the lower corner of Lander's coat pocket when he was patting it down for weapons. In order to reach a conclusion that this object was a piece of crack cocaine, the State necessarily relies upon Officer House's training and experience with respect to crack cocaine, which appears to have been extensive. Significantly, Officer House made no claim that he had probable cause to believe that the object was crack cocaine. On each of the two occasions when he covered this point in his testimony, he used the word "suspected" to describe his conclusion, clearly indicating that his conclusion that the object might be crack cocaine was merely a suspicion, rather than probable cause to believe, that the object was crack cocaine.
Perhaps, if Officer House had been asked whether he had concluded that the object was more likely than not crack cocaine, he would have responded in the affirmative. He was never asked that question. Because this was a warrantless seizure, the State had the burden of proof on this issue, and the State failed to establish that Officer House had probable cause to believe that the object he felt was crack cocaine when he removed it from her coat pocket.
Lander's sole Assignment of Error is sustained.
 III
Lander's sole Assignment of Error having been sustained, the judgment of the trial court is Reversed, and this cause isRemanded for further proceedings consistent with this opinion.
BROGAN and YOUNG, JJ., concur.