[Cite as *State v. Alcorn*, 2011-Ohio-2058.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 23993 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 09-CR-2790 |
| v. | : | |
| | : | |
| PHILLIP J. ALCORN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 29th day of April, 2011.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JOHNNA M. SHIA, Atty. Reg. #0067685, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

CHRISTOPHER L. WESNER, Atty. Reg. #0082699, Chris Wesner Law office, LLC, 430 North Wayne Street, Piqua, Ohio 45356
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant Phillip J. Alcorn appeals from his conviction and sentence, following a no-contest plea, upon one count of Possession of Heroin, and one count of Possession of Drug Paraphernalia. He contends that the trial court erred in overruling his

motion to suppress, because the pat-down search leading to the discovery and seizure of the heroin and marijuana pipe was not based upon a reasonable belief that he was armed and dangerous.

{¶ 2} We conclude that the pat-down search was justified, based upon the totality of the circumstances. Accordingly, the judgment of the trial court is Affirmed.

I

{¶ 3} One August evening in 2009, at about 6:30 p.m., Dayton Police Narcotics Detective Patrick Bell was on patrol, conducting surveillance at a Shell gas station, based upon complaints of people loitering there for the purpose of buying and selling drugs. Bell noticed a white Geo Tracker parked neither at the gas pumps, nor in the parking spaces in front of the associated store. The three occupants remained sitting in the car for five minutes, looking around.

{¶ 4} Then, one of the occupants (not Alcorn) left the car, went to a pay phone, either made several phone calls, or attempted several times to make a call, and then returned to the car. After a few minutes, the car drove over to a parking spot in front of the store and parked. The same occupant who had used the pay phone then went into the store for less than 30 seconds, and returned to the car, without entering it. After a consultation lasting less than fifteen seconds, this individual again went to the pay phone and used it, to make calls, or at least to attempt to make calls.

{¶ 5} The individual then got back in the car, which remained parked for a couple of minutes, then left the gas station and headed eastbound on Germantown.

{¶ 6}   Bell followed the car, noticing that it had an out-of-county license plate.   Bell explained that it was common for people from other counties to come to Dayton to buy drugs, because there are more drugs available, and they are cheaper, than are available in the suburbs.   The Tracker drove into the City of Dayton, into areas with even higher rates of illegal drug transactions.

{¶ 7}   Bell lost track of the car for three to four minutes, but then found it again, and resumed following it.   The car proceeded very slowly down Germantown; the occupants looked around, as if they were unsure where they were going.   The car then made a right turn on Danner, and into the Desoto Bass housing project, which Bell testified has a reputation as the highest drug-related and crime-related area in the City of Dayton.   The car parked in the project, and nothing happened for fifteen minutes.

{¶ 8}   A man then approached the driver's side of the Tracker, within three to four feet, and communicated with the occupants.   The man then walked away.   After a few minutes, the Tracker left the project.   As soon as the Tracker pulled onto Danner, a gold Oldsmobile pulled into Danner and followed right behind it, "almost on its bumper."

{¶ 9}   As the two cars, the Tracker and the Oldsmobile, proceeded westbound on Germantown, a marked Dayton police cruiser pulled onto Germantown from a side street and got right behind the two cars.   The two cars immediately split up, going in opposite directions.   Bell followed the Tracker, which returned to the Shell station where Bell had first noticed it, and parked in the space in which it had previously parked.

{¶ 10} The Oldsmobile then arrived, from a different direction, and parked right next to the Tracker.   A total of five people, one of whom was Alcorn, got out of the two cars; four

went to the pay phone, and one of them used the pay phone several times. They all then returned to their cars. At this point, based upon his experience, Bell formed a conclusion that the occupants were attempting to purchase illegal drugs. Bell requested assistance.

{¶ 11} Alcorn got into the Oldsmobile, and the Oldsmobile drove off before other police detectives arrived on the scene. Bell remained at the scene with the Tracker.

{¶ 12} About five minutes later, the Oldsmobile returned. Alcorn talked to the occupants of the Tracker. Alcorn then got into the driver's seat of the Tracker, and both cars left the Shell station and got back on Germantown. By this time, other detectives in other unmarked cruisers had arrived on the scene, and a decision was made to stop the cars.

{¶ 13} Police Detective Joey Myers made contact with Alcorn, who was now the driver of the Tracker. He ordered Alcorn out of the car, and conducted a pat-down search for weapons. During the pat-down, Myers immediately recognized a hard, metal marijuana pipe in Alcorn's left front shorts pocket, which Myers retrieved. Myers also immediately recognized a gelatin capsule in the same pocket, which, based on his experience recovering similar capsules during "thousands of time[s] in doing drug investigations," he recognized as a common packaging for heroin and cocaine. He retrieved this capsule, which was ultimately determined to contain heroin.

{¶ 14} Alcorn was arrested, and later charged by indictment, with one count of Possession of Heroin, and one count of Possession of Drug Paraphernalia. He moved to suppress the evidence. Following a hearing, his motion to suppress was overruled. He then pled no contest to the charges, was convicted, and was sentenced to community control sanctions for a period of time not to exceed five years.

{¶ 15} From his conviction and sentence, Alcorn appeals.

II

{¶ 16} Alcorn's sole assignment of error is as follows:

{¶ 17} "THE TRIAL COURT ERRED IN DENYING THE MOTION FOR THE SUPPRESSION OF EVIDENCE OF THE DEFENDANT-APPELLANT PHILLIP J. ALCORN."

{¶ 18} In his argument in support of his assignment of error, Alcorn does not challenge the propriety of the stop. Nor does he challenge the seizure of the evidence, once Myers felt the evidence, recognizing the marijuana pipe and the drug capsule for what they were. He argues that "the State did not meet its burden of showing that its agents possessed a reasonable, articulable suspicion that [he] was armed and dangerous prior to their pat-down search."

{¶ 19} Alcorn recognizes that the Supreme Court of Ohio has opined, in *State v. Evans*, 67 Ohio St.3d 405, 413, 1993-Ohio-186, that: "The right to frisk is virtually automatic when individuals are suspected of committing a crime, like drug trafficking, for which they are likely to be armed." He argues that *State v. Evans* was based upon *State v. Williams* (1990), 51 Ohio St.3d 58, which it cites, and that *State v. Williams* involved a large quantity of drugs – growing marijuana plants in that case. Alcorn argues that his case is distinguishable, because there was no reason for the officers to believe that a large quantity of drugs was involved.

{¶ 20} But *State v. Evans*, supra, involved a situation where a car was stopped for a burned out headlight, and during the stop, there was a dispatch that a man matching the driver

of the car they had stopped "had just made a drug transaction." Id., at 406. The amount of drugs involved in the suspected drug transaction was never specified. In *Evans*, as in the case before us, only a small quantity of drugs was seized. Thus, even if *State v. Williams*, supra, might be distinguishable based upon the quantity of the drugs involved, there does not appear to be a similar basis for distinguishing *State v. Evans*.

{¶ 21} Alcorn relies upon *State v. Warren* (1998), 129 Ohio App.3d 598, a decision of the First District Court of Appeals. The majority opinion in that case (there was a dissenting opinion) distinguished *State v. Williams*, supra, based upon the quantity of the drugs involved, but did not cite or discuss *State v. Evans*, supra (neither did the dissenting opinion).

{¶ 22} We conclude that *State v. Warren*, supra, is distinguishable. In reaching this conclusion, we need not decide, nor do we decide, whether we would follow *State v. Warren* – i.e., whether we would decide that case similarly on its facts. The stop in *State v. Warren* was based solely upon two uniformed police officers having observed two men, in a high-crime area of Cincinnati, one of whom dropped a tissue upon noticing the officers, with one of the officers rubbing his foot against the tissue and concluding that it held a small amount of cocaine. Only after these observations did the officers stop the men.

{¶ 23} In the case before us, Bell's observations led him to have a reasonable, articulable suspicion that a drug transaction was being arranged, in an area notorious for illegal drug transactions. This was not a mere possession of a small quantity of cocaine, as in *State v. Warren*; this was an arranged purchase of illegal drugs, presumably from a dealer in illegal drugs. We conclude, therefore, that the police officers in the case before us had a reasonable belief that the persons involved in the suspected drug transaction would be armed

and dangerous.   Accord, see *State v. Martin*, Montgomery App. No. 20270, 2004-Ohio-2738.

{¶ 24} Alcorn's sole assignment of error is overruled.

III

{¶ 25} Alcorn's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

DONOVAN and FROELICH, JJ., concur

Copies mailed to:

Mathias H. Heck
Johnna M. Shia
Christopher L. Wesner
Hon. Timothy N. O'Connell