OPINION
On July 26, 2000, Defendant/Appellant, Jason Wolf, pled no contest to possession of drug paraphernalia. The court then found Wolf guilty and imposed a sentence of thirty days in jail, a $250 fine, and a driver's license suspension of 180 days. However, the court suspended the jail sentence and placed Wolf on two years probation. Additionally, the court granted a stay of execution of the sentence pending appeal.
The no contest plea occurred shortly after the trial court overruled Wolf's motion to suppress. Wolf now appeals, raising the following assignments of error:
 I. The trial court below erred when it denied Mr. Wolf's motion to suppress evidence obtained after he was unlawfully stopped by the officer.
 II. The trial court erred when it denied Mr. Wolf's motion to suppress evidence obtained after the officer's search exceeded that allowed by a Terry pat down.
Based on the record and applicable law, we find both assignments of error without merit, and will affirm the trial court judgment.
 I
Normally, when we review suppression decisions, we accept the trial court's findings of fact if "they are supported by competent, credible evidence." State v Darden (Nov. 24, 1999), Montgomery App. No. 17395, unreported, p. 3 (citations omitted). We then decide, de novo, if "the trial court's conclusions of law, based on those findings of fact, are correct." Id. (citation omitted). The reason we accept the trial court's findings of fact is because trial courts are in the best position to evaluate witness credibility. Id. However, if only one witness testifies, there are really no credibility issues to be resolved, unless the witness contradicts his or her own testimony. In that event, the trial court would still be in the best position to resolve the conflict.
In the present case, Centerville Police Sergeant, Joseph Lavigne, was the only witness who testified at the suppression hearing. According to Lavigne, the following events precipitated the charge against Wolf.
On March 23, 2000, Lavigne heard on his police radio that two officers (Hawley and Eshler) had been dispatched to County Manor Lane on a dispute between two neighbors. The dispatch information indicated that the dispute may have involved a gun. When Lavigne arrived at the scene, he saw Hawley and Eshler actively speaking with two people in front of an apartment building (number 50). The apartment buildings were connected to each other, and 50, 40, and 30 were part of one big building.
Lavigne did not really speak to the other officers when he arrived, nor did he know any details of their investigation. Instead, upon being told that "Forty's over there," Lavigne went to stand in front of the doorway to building 40. His job was to watch and protect the scene in case someone had a weapon and came out of the building. While Lavigne stood in front of building 40, he could hear the conversation between the officers and the two people. Lavigne did not testify in detail about the content of this discussion. However, he did say that he could hear them talking about the complaint. At this time, Lavigne also heard that "he" (presumably the person with the gun) lived in the basement of building 40. Lavigne assumed the officers were talking to the people who had called in the complaint about the gun. However, he did not actually know if this was the case, i.e., he did not know if the people the police were talking to had a gun, or if the person in building 40 was the one with the gun.
Shortly thereafter, Lavigne saw a person (later identified as Wolf) come up the stairwell from the basement of building 40. After Wolf walked out the front door of the building, Lavigne asked him which apartment he lived in. Wolf pointed down to the basement, and said that someone had just kicked in his door. Based on this information, Lavigne figured that Wolf was the other party involved in the dispute.
At that point, Lavigne asked Wolf if he would walk over to the cruiser. Wolf complied. When Lavigne asked if Wolf had any weapons, Wolf admitted that he had a Glock handgun. However, Wolf said the gun was at his parents' house. Wolf was very cooperative and Lavigne did not see any bulges that appeared to be guns. On the other hand, Wolf had on baggy clothing and was carrying a backpack. For officer safety purposes, Lavigne then patted Wolf down. He did not feel anything that was obviously a firearm. He did feel two hard objects in the right front pocket of Wolf's pants. Lavigne was not sure what the items were, and did not know that what he felt was not a weapon. Accordingly, Lavigne asked Wolf what the objects were. In response, Wolf reached in his pocket and pulled out a cigarette lighter. After Lavigne asked what the other object was, Wolf reached into his pocket and pulled out a glass pipe. Lavigne identified the item as a marijuana pipe and confiscated it immediately.
After hearing the above testimony, the trial court overruled the motion to suppress. Specifically, the court found that Sergeant Lavigne engaged in a reasonable conversation with Wolf and conducted a pat-down search for his own safety. The court also found that Wolf voluntarily produced the disputed evidence.
As we mentioned, Wolf contends in the first assignment of error that the original stop was unlawful because Lavigne did not have an articulable, reasonable suspicion of criminal activity on Wolf's part. In this regard, Wolf focuses on two points. First, he notes that Lavigne did not witness any criminal activity. Second, Wolf says that the dispatch did not give Lavigne a description of the suspect, nor did the dispatch provide any information about who the victim was or who Lavigne should contact once he arrived on the scene.
To support his position, Wolf cites a number of Ohio cases which deal with anonymous tips and inchoate "hunches" used to justify Fourth Amendment seizures. For example, in State v. Alsup (Jan. 31, 1997), Montgomery App. No. 15483, unreported, we held that an officer could not stop and search an individual frequenting an area with a high concentration of prostitutes based on nothing more than an "inchoate hunch" that criminal activity was afoot. Id. at p. 2. Likewise, in State v Damron (Feb. 20, 1985), Montgomery App. No. 8703, unreported, we found a search and seizure improper where the police received an anonymous tip that the occupants of a certain parked car had a sawed-off shotgun. In part, we focused on the lack of information in the record about the informant's identity or reliability. We also stressed that the tip information involved innocent details many people might know and did not indicate that the individuals in the car were involved in crime. Id. at pp. 5-6.
According to Wolf, Damron is factually similar to the present case and requires reversal of the trial court's suppression decision. However, we disagree. For one thing, the informants in Damron were never identified. In contrast, once the police in the present case came to the scene, they spoke with identified individuals about the alleged crime. As a result, this case does not involve an anonymous informant. Instead, it consists of the kind of situation police officers encounter every day — they are dispatched to a particular location based on a citizen complaint, and then investigate the matter after they arrive, by speaking with the persons who made the complaint, or with bystanders who witnessed the particular event. Admittedly, Lavigne did not speak directly to the complainants, but that does not turn them into anonymous informants.
As an additional matter, Lavigne received independent corroboration connecting Wolf to the incident once he arrived at the scene. As we mentioned earlier, even though Lavigne was not actually certain of the status of the people talking to the police, he did know that the individual alleged to have a gun lived in the basement of building 40. Shortly after Lavigne heard this information, Wolf exited the basement of building 40 and confirmed that he lived in the basement. Wolf also said that his door had been kicked in. According to Lavigne, this latter statement meant that Wolf was the other party involved in the dispute. Thus, we think that under the totality of the circumstances, Sergeant Lavigne had a reasonable, articulable suspicion of criminal activity on Wolf's part. Accordingly, Lavigne did not act unlawfully by briefly detaining Wolf.
Since the investigatory stop of Wolf was lawful, the first assignment of error is without merit and is overruled.
 II
In the second assignment of error, Wolf contends that even if the stop was justified, Sergeant Lavigne exceeded the permissible scope of the "pat-down" search. While this issue is close, we cannot find that Wolf's rights were violated.
In State v. Evans (1993), 67 Ohio St.3d 405, the Ohio Supreme Court held that:
 [w]hen an officer is conducting a lawful pat-down search for weapons and discovers an object on the suspect's person which the officer, through his or her sense of touch, reasonably believes could be a weapon, the officer may seize the object as long as the search stays within the bounds of Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.
Id. at 405-06, paragraph two of the syllabus. In clarifying what would be within the bounds of Terry, the Court stressed that officers need not be "absolutely convinced" that objects are weapons before grounds for removal exist. Id. at 415. On the other hand, a hunch is not enough. In this regard, the Court said that "[w]hen an officer removes an object that is not a weapon, the proper question to ask is whether that officer reasonably believed, due to the object's `size or density,' that it could be a weapon." Id. (citation omitted). The Court also distinguished between soft and hard objects, by noting that more leeway should be given "upon ` the feeling of a hard object of substantial size, the precise shape or nature of which is not discernible through outer clothing,' which is most likely to occur when the suspect is wearing heavy clothing." Id.
In Evans, a police officer had removed a large wad of money and a rock of cocaine from the defendant's pocket during a "stop and frisk." At the suppression hearing, the officer admitted knowing the object was not a gun. However, the officer also said that he could not tell by touch if the object was a knife or other weapon. Id. at 416. Based on this testimony, the Ohio Supreme Court held that the objects were permissibly removed. In this regard, the court specifically noted that "`[iIf by touch the officer remains uncertain as to whether the article producing the bulge might be a weapon, he is entitled to remove it.'" Id., quoting from United States v. Oates (C.A.2, 1977), 560 F.2d 45, 62.
The State contends in its brief that the search in the present case was proper under Evans. In contrast, Wolf believes the State failed to prove that Sergeant Lavigne's search fell within the permissible bounds of Terry. In particular, Wolf relies on Lavigne's alleged concession that the objects he felt could not be weapons. Unfortunately, the testimony was not quite as unequivocal as Wolf suggests.
During cross-examination by the defense, Lavigne testified that he patted Wolf down for purposes of officer safety. The following exchange then took place:
Q: All right. And you patted down his clothing.
A. That's correct.
Q. Okay. And is it fair to say you didn't feel a gun?
A. I didn't find a gun. No.
 Q. You didn't feel a gun. Nothing that felt like a gun stood out.
A. Well, I don't know what those objects in his pocket were.
 Q. No. No. My question is you didn't feel anything you thought, "There's a gun."
A. No. Nothing that would have been obviously a firearm.
 During later cross-examination, Lavigne further testified as follows:
 Q: I imagine a paperclip would be considered a weapon in certain circumstances, could it not?
A. Depends on how it's used.
 Q. Right. But in the ordinary sense of a gun, that being the weapon you were looking for, this isn't what you felt in the ordinary sense, is that a fair statement?
A. That would be a fair statement.
If this had been the only testimony, we might be inclined to agree with Wolf. However, on redirect examination, Lavigne testified that a physical description of the gun was not given during the dispatch. He additionally said that many mini-revolvers are the approximate size of a marijuana pipe in length. Most significantly, Lavigne said that when he patted down Wolf's pocket, he did not know that the object was not a gun. And finally, during recross-examination, Lavigne stressed that many different weapons were "out there," and that he did not know what weapon Wolf might have. To the extent that any conflicts existed in this testimony, the trial court obviously resolved them in favor of the State. Again, the trial court was in the best position to assess credibility.
As we said, we think the issue is close. Compare Matter of Coleman (Dec. 30, 1993), Cuyahoga App. No. 65459, unreported, p. 6 (where the Eighth District Court of Appeals was unimpressed by an officer's testimony that a small hard object in the defendant's pocket could have been "almost anything," including a knife or gun). As the Eighth District noted in Coleman, existing search and seizure cases, including Evans, require officers "to `think' and to, at least, attempt to make a determination of exactly what they are feeling on patdown." Id. We agree that officers need to think when they are conducting searches. Likewise, officers cannot justify wide-ranging searches for contraband under the pretext of looking for weapons. In fact, the Ohio Supreme Court made this very point in Evans. See 67 Ohio St.3d at 415-16.
Based on the testimony, however, we cannot conclude that the search was merely a pretext. Ordinarily, we "give substantial deference to the officer's judgments and decline to second-guess the person on the scene." State v. Hill (Nov. 24, 1993), Montgomery App. No. 13959, unreported, p. 2. In the absence of testimony contradicting Sergeant Lavigne's account, or indicating that his conduct was unreasonable, we will give his judgment substantial deference. Like the officer in Evans, Lavigne was, at the least, uncertain whether Wolf had a weapon. Even if the weapon was not a gun, Lavigne was entitled to take reasonable precautions for his own safety. Moreover, no evidence implies that the search was a ruse to unearth contraband.
As a final point, we note that both the State and defense refer in their briefs to the police report, which includes two witness statements. The report and statements were attached to the suppression transcript as Exhibit A. However, the trial court was not given these documents until after the suppression decision was made, and considered them only in the context of accepting Wolf's "no contest" plea. Accordingly, we have confined our factual consideration only to the testimony Sergeant Lavigne gave at the suppression hearing.
In light of the above discussion, the second assignment of error is overruled. Having found no merit in either assignment of error, we affirm the judgment of the trial court.
 ________________ BROGAN, J.
FAIN, J., and YOUNG, J., concur.