OPINION
{¶ 1} Defendant-appellant Sumpter Miller appeals from his conviction and sentence, following a bench trial, on one count of possession of over 100 grams of crack cocaine, with a major drug offender specification, and one count of possession of more than 200 grams of marijuana. Miller contends that the trial court erred by denying his motion to suppress evidence obtained at the time of his initial detention and arrest, that there is insufficient evidence to support his conviction for possession of crack cocaine and marijuana found in a car, and that there is insufficient evidence, in any event, that he possessed in excess of 100 grams of crack cocaine. Miller further contends that the trial court abused its discretion by denying his motion for a continuance of the trial, made about a week before trial.
 {¶ 2} We conclude that the trial court did not err in denying Miller's motion to suppress, because even if the police officer who searched Miller's sweat pants for weapons did not have a proper basis, at that time, to do so, Miller's detention for purposes of determining his identity, his association, if any, with a drug transaction that had taken place in his presence shortly before, and a determination whether there were any outstanding warrants for his arrest, was reasonable; and, when it was discovered that there was an outstanding warrant for Miller's arrest, the contraband found in his sweat pants would inevitably have been discovered either as part of a search incident to arrest, or as part of an inventory of Miller's personal effects upon arrival at the jail. Because the car in which contraband was also found was reasonably going to be towed, the contraband found therein would inevitably have been discovered, either as a result of the inventory incident to the tow, or as a result of the discovery of the contraband and key to the car that would inevitably have been found in Miller's sweat pants. Furthermore, because even before the car was searched the police detected a strong odor of marijuana coming from the car, there was an independent basis for the search of the car.
 {¶ 3} We conclude that the evidence is sufficient to support a conclusion, beyond reasonable doubt, that Miller had possession of the marijuana and crack cocaine found in the trunk of the car, as well as the marijuana and crack cocaine found in his sweat pants. Furthermore, although the testimony varied concerning the amount of crack cocaine found, all accounts put the total amount in excess of 100 grams. Therefore, we conclude that there is sufficient evidence to support the trial court's finding in that regard.
 {¶ 4} Finally, we conclude that the trial court did not abuse its discretion in deciding to deny Miller's motion for a continuance of the trial, which had been set for three months, made one week before trial. Accordingly, the judgment of the trial court is affirmed.
 I {¶ 5} During the 5:00 p.m. to 3:00 a.m. shift on May 30, 2002, a team of twelve Dayton police officers belonging to a drug strike force assembled to execute a search warrant for a house located at 937 Ethel Avenue. The search was preceded by a controlled buy at that location. The confidential informant making the controlled buy emerged from the house, followed by defendant-appellant Sumpter Miller and a man by the name of Tolbert. Miller and Tolbert went to a silver Monte Carlo that was parked in front of the house. Miller sat on the trunk of the Monte Carlo, while Tolbert stood next to him. Tolbert was later identified as the individual who sold the drugs to the confidential informant, with Miller being present at that time.
 {¶ 6} The strike force then began moving towards the residence, with most, but not all, members of the strike force having their guns drawn. The members of the strike force were all in distinctive uniforms clearly marking them as police officers, although these uniforms were of the variety commonly worn by "SWAT" officers.
 {¶ 7} Miller and Tolbert both took off running when they saw the police officers approaching. Detective David House chased after Miller. House chased Miller into a heavily wooded vacant lot. Both Miller and House had difficulty traversing this heavily wooded area. Miller was wearing sweat pants that appeared to have heavy objects in the pockets. In the course of trying to get through the heavily wooded area, Miller wound up on the ground, with his sweat pants almost completely off, inverted, remaining attached to him only by the elastic cuffs around his ankles. House testified that Miller did not stop resisting, and trying to escape, until Miller was handcuffed. By this time, another police officer was assisting House, and Detective Tim Braun also arrived at that location.
 {¶ 8} House testified that his purpose in stopping Miller was to determine Miller's identity, to determine Miller's relationship, if any, to the drug transaction that had taken place at 937 Ethel Avenue, and to determine whether there were any warrants outstanding for Miller's arrest. He testified that he was not initially attempting to effect Miller's arrest, but merely to detain him. House testified that he only handcuffed Miller when it became obvious that Miller would not cooperate, but would, instead, attempt to flee.
 {¶ 9} Braun testified that it was his job to conduct field interviews and to check whether there were any outstanding warrants. Because Braun observed Miller and House having difficulty extricating themselves from the heavily wooded vacant lot, compounded by Miller's being both handcuffed and handicapped by the sweat pants that were now inverted and attached to him only by the elastic cuffs at his ankles, Braun removed Miller's sweat pants. It was evident to Braun that there were heavy objects in the pockets of his sweat pants. Braun was concerned that a weapon might be involved, and searched the pants for the purpose of determining whether there was a weapon. Braun found no weapon, but felt an object that he immediately recognized as crack cocaine. He removed this object, and verified that it appeared to be crack cocaine. He then found marijuana, currency and car keys in the pockets of the sweat pants.
 {¶ 10} Braun obtained Miller's name from Miller, and ran it through his computer system to determine whether Miller was wanted. Braun determined that Miller "had an active Dayton capias * * * for no driver's license."
 {¶ 11} The police were naturally interested in the silver Monte Carlo parked at the scene. House testified that the car was illegally parked, in that it was too far from the curb. When the police ran the license plates on the silver Monte Carlo, they found that the registration was for a 1992 Buick, which obviously did not correspond to the silver Monte Carlo. When asked, Miller denied that the car was his. He said that the car belonged to the lady next door. House then went and talked to the lady next door, whose name was Donna Bell. Bell told House that the car was not hers, but belonged to "them next door." She told House that the car was always there, and that the individuals next door were always at the car and hanging around the car.
 {¶ 12} Lieutenant Mike Wilhelm instructed House to tow the Monte Carlo. As House approached the Monte Carlo, he could smell "a very strong odor of marijuana coming from the interior of the vehicle." At this point, the officers attempted to use the key recovered from Miller to unlock the Monte Carlo. The key fit into the driver's side door, but the lock appeared to be broken — the key just spun around inside without accomplishing anything. The lock on the passenger's side door appeared to be completely broken.
 {¶ 13} The Monte Carlo had a "T-top," which House lifted in an effort to unlock the door from inside. When House lifted the T-top up, "the odor of marijuana increased many times." Eventually, House was able to get the passenger door open. Braun used one of the keys recovered from Miller's sweat pants to start the ignition of the car. The officers were unable to open the trunk of the car from outside, but eventually gained access to a part of the trunk through the back seat of the car. A black cloth duffle bag was recovered. Inside this bag "there were numerous bags containing marijuana and two bags containing a large quantity of crack cocaine in each bag."
 {¶ 14} Miller was arrested, both pursuant to the existing arrest warrant, and for drug offenses. He was ultimately indicted upon one count of possession of more than 100 grams of crack cocaine, with a major drug offender specification, and upon one count of possession of more than 200 grams of marijuana.
 {¶ 15} Miller moved to suppress the evidence, contending that it was obtained as the result of an unlawful search and seizure. Following a hearing, this motion was denied. Initially, Miller was represented by Kenneth Lawson. In July, 2002, Lawson moved to withdraw, because Miller could no longer afford to pay him. Ben Swift, of the Public Defender's office, was assigned as Miller's attorney of record.
 {¶ 16} After numerous continuances, all upon Miller's motion, the motion to suppress was heard on June 13, 2003. The motion was denied by entry filed four days later, on June 17, 2003. Thereafter there were a number of continuances of proceedings, all of which were on Miller's motion. There were also a number of scheduling and re-scheduling orders, although it is not clear whether these additional orders were at Miller's request, or for some other reason.
 {¶ 17} On March 26, 2004, Kenneth Lawson, Miller's original retained attorney, filed a notice of appearance as co-counsel. On March 31, 2004, Miller filed a motion for a continuance of the trial, which was set for April 6, 2004. It appears that this motion was earlier made orally, or at least some notice of this motion was given earlier, because the State filed an objection to the motion for continuance on March 30, 2004. The trial court overruled the motion for continuance.
 {¶ 18} Miller's having waived his right to a trial by jury, this case was tried to the bench. The trial court found Miller guilty of both counts, and guilty of the major drug offender specification pertaining to the first count. A judgment of conviction was entered, and Miller was sentenced accordingly. From his conviction and sentence, Miller appeals.
 II {¶ 19} Miller's First Assignment of Error is as follows:
 {¶ 20} "THE TRIAL COURT ERRED WHEN IT OVERRULED MR. MILLER'S MOTION TO SUPPRESS THE RESULT OF THE SEARCH OF HIS PANTS WHICH DID NOT POSE A DANGER TO ANY OFFICER OR OTHER PERSON, AND WHICH VIOLATED HIS RIGHTS UNDER THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 14, ARTICLE ONE OF THE OHIO CONSTITUTION."
 {¶ 21} Miller concedes, at least for purposes of this appeal, that he was properly detained for the purposes of a brief, investigative stop, pursuant to Terry v. Ohio (1968),392 U.S. 1. While Miller recognizes that a person detained for a brief, investigative stop may be frisked for weapons where the officers have reason to believe that a weapon is present, Miller asserts that a Terry pat-down search is limited in scope to discovering weapons that might be used to harm the officer, and cannot be employed by the searching officer to search for evidence of a crime. State v. Evans (1993), 67 Ohio St.3d 405, 414. Miller contends that because he had already been handcuffed, and the sweat pants were no longer on his person or in his possession, but were in the possession of Braun when Braun searched them for weapons, the search cannot be justified as a weapons pat-down search. Miller argues, further, that because the search of his sweat pants was unlawful, the subsequent search of the Monte Carlo, and the recovery of contraband therefrom, must also be excluded as fruit of the poisonous tree, because it was the recovery of the contraband from the sweat pants that led to the search of the Monte Carlo.
 {¶ 22} The State attempts to justify the search of the sweat pants on the theory that it was reasonable to secure a weapon that might otherwise pose a threat to public safety, even though there was no likelihood that Miller, who was handcuffed, would gain access to it. The State argues, alternatively, that Miller was under arrest at the time the contents of the pockets were discovered, so that the pat-down was part of a valid search incident to his arrest. This latter argument appears to be inconsistent with police officer House's testimony. House testified that he had not yet arrested Miller, but was merely detaining Miller in order to determine Miller's identity, to determine Miller's relationship, if any, to the drug transaction that had earlier taken place at 937 Ethel Avenue, and to determine whether there were any outstanding warrants for Miller's arrest. House testified that he only handcuffed Miller because Miller was resisting detention, and, in fact, continued attempting to flee the scene.
 {¶ 23} We find it unnecessary to determine the validity of either of the arguments offered by the State, because, in our view, there is another basis upon which to uphold the trial court's decision not to exclude the evidence. Illegally obtained evidence is properly admitted in a trial court proceeding once it is established that the evidence would have been ultimately or inevitably discovered during the course of a lawful investigation. State v. Perkins (1985), 18 Ohio St.3d 193,196,480 N.E.2d 763. In our view, House's decision to detain Miller for the purpose of determining his identity, his relationship to the prior drug transaction, and whether any warrants were outstanding for his arrest, was reasonable under the circumstances, and, in fact, we understand Miller to be conceding as much. There was, in fact, an outstanding warrant for Miller's arrest. This fact was determined, without any apparent difficulty, by Braun, whose job it was to make that determination. Because Miller was going to be arrested in any event, the sweat pants that he was wearing when he was initially confronted were inevitably going to be searched, either as a search incident to his arrest, or in the course of an inventory of his personal effects upon arrival at the jail. In this connection, we note that, other than Miller's underwear, the sweat pants were the only pants that he was wearing at the time. It is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed. Illinois v. Lafayette (1983),462 U.S. 640, 646, 77 L.Ed.2d 65, 103 S.Ct. 2605, 2609. Thus, regardless of the propriety of Braun's having patted down Miller's sweat pants at the time that he did so, the evidence so obtained was properly not excluded because it would inevitably have been discovered anyway.
 {¶ 24} An issue remains, however, concerning the contraband found in the Monte Carlo. In our view, the trial court properly denied the motion to suppress this evidence, also. There are two grounds for our conclusion. The first is that before the car was searched, House smelled a "very strong odor of marijuana" coming from the car. This, together with the mis-match of the silver Monte Carlo with the 1992 Buick corresponding to the registration of the license plate, the fact that although Miller denied owning the car, the person whom he claimed owned the car told House that the car belonged to the individuals at 937 Ethel Avenue, as well as the drug transaction occurring previously at 937 Ethel Avenue, gave the police officers probable cause to believe that contraband could be found in the car. Furthermore, although police officers had one key that, as they later discovered, could be used to start the car, there might well be other keys in existence capable of starting the car. This constituted an exigent circumstance justifying a search of the car before it could be removed from the scene by other persons.
 {¶ 25} The second ground upon which we would uphold the admission in evidence of the contraband found in the car is the fact that it, also, would inevitably have been discovered. House testified that the car was going to be towed because it was illegally parked, and because it did not match the car to which the license plates were registered. Although it could be argued that the State failed to produce evidence that routine procedure would involve an inventory of the car, which would lead to the discovery of the contraband, the fact remains that the outstanding warrant for Miller's arrest either had already been discovered, or was shortly going to be discovered, and this, in turn, would inevitably have led to the discovery of the contraband in Miller's sweat pants, and the car key in Miller's sweat pants. It is clear that these matters would have been discovered while the car was still in the possession of the police, amenable to a search. We conclude, therefore, that the discovery of the contraband in the car was inevitable.
 {¶ 26} Miller's First Assignment of Error is overruled.
 III {¶ 27} Miller's Second Assignment of Error is as follows:
 {¶ 28} "THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT MR. MILLER'S CONVICTION FOR POSSESSION OF THE CRACK COCAINE AND MARIJUANA FOUND IN THE MONTE CARLO AND INSUFFICIENT EVIDENCE EXISTS TO SUPPORT THE MAJOR DRUG OFFENDER SPECIFICATION."
 {¶ 29} To possess, or possession, "means having control over a thing or substance
 {¶ 30} . . ." R.C. 2925.01(K). "Constructive possession exists when an individual exercises dominion and control over an object, even though that object may not be within his immediate physical possession." State v. Wolery (1976), 46 Ohio St.2d 316, 329,348 N.E.2d 351. Where contraband is found in an automobile, "the possession of the keys to [an] automobile is a strong indication of control over the automobile and all things found in or upon the automobile." State v. Brittman (Feb. 10, 1994), Franklin App. No. 93 AP-1005. Also probative of an individual's control of drugs found in an automobile is the presence of drugs on that individual's person. State v. Barfield (Sept. 10, 1999), Ross App. 98-CA-2454.
 {¶ 31} At trial, the State presented evidence of the following facts:
 {¶ 32} (1) Before Miller saw the police approaching 937 Ethel, he was sitting on the trunk of the Monte Carlo;
 {¶ 33} (2) Miller fled from the Monte Carlo immediately after seeing the police moving towards the apartment at 937 Ethel;
 {¶ 34} (3) Miler had baggies of crack cocaine and marijuana in his pockets;
 {¶ 35} (4) Miller was carrying a key that operated the ignition of the Monte Carlo;
 {¶ 36} (5) When asked, Miller denied that the Monte Carlo was his, and said that it belonged to the neighbors at 939 Ethel;
 {¶ 37} (6) The resident of 939 Ethel said that the Monte Carlo was not hers, but that it belonged to the people next door, who were always hanging around the car; and
 {¶ 38} (7) Miller often had possession or control over cars that were not legally titled in his name.
 {¶ 39} We agree with the State that these facts, taken together, and viewed in a light most favorable to the State, are sufficient to persuade a reasonable mind, beyond reasonable doubt, that Miller had dominion and control over the drugs found in the trunk of the Monte Carlo.
 {¶ 40} Miller also contends that the evidence is not sufficient to prove that the amount of crack cocaine was in excess of 100 grams. Miller points to one report, in which the amounts of crack cocaine were reported as 113.3 grams in one baggie, and 4.9 in another baggie; a second report, in which the amount of crack cocaine in one baggie was listed as 97.26 grams, and the amount of the other baggie was listed at 3.74 grams; a third version in which the amount of grams of crack in one baggie is listed as 110.3, and the amount of grams of crack in the other baggie is listed as 4.9; and a fourth version in which the amount of the crack cocaine was described as "approximately 110, 115 grams."
 {¶ 41} Significantly, the total amount of grams of crack cocaine in each of these versions exceeds 100 grams. Accordingly, we conclude that when the evidence is viewed in a light most favorable to the State, a reasonable mind could find, beyond reasonable doubt, that the total grams of crack cocaine in Miller's possession exceeded 100 grams.
 {¶ 42} Miller's Second Assignment of Error is overruled.
 IV {¶ 43} Miller's Third Assignment of Error is as follows:
 {¶ 44} "THE TRIAL COURT'S DENIAL OF MR. MILLER'S MOTION FOR A CONTINUANCE OF THE TRIAL DATE DEPRIVED HIM OF HIS RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AND HIS SIXTH AMENDMENT RIGHT TO RETAINED COUNSEL OF HIS CHOOSING."
 {¶ 45} Although, as Miller notes, a trial court may not "arbitrarily and unreasonably" interfere with a defendant's right to be represented by the attorney he has selected, the grant or denial of a continuance is a matter entrusted to the broad, sound discretion of the trial judge, and an appellate court may not reverse the denial of the continuance unless there has been an abuse of discretion. State v. Unger (1981), 67 Ohio St.2d 65,67, 423 N.E.2d 1078. In its decision denying Miller's motion for a continuance, the trial court made the following findings:
 {¶ 46} "(1) The Defendant in this matter was indicted by the Montgomery County Grand Jury on June 7, 2002, having been charged with, among other counts, a serious drug offense carrying a specification as to being a major drug offender. The Defendant was arraigned on June 11, 2002. At the arraignment, the Defendant was represented by Attorney Kenneth L. Lawson;
 {¶ 47} "(2) On July 16, 2002, Attorney Kenneth L. Lawson was permitted to withdraw as Defendant's attorney because `the Defendant is unable to pay retained counsel on this case.' The Court in addition to permitting Mr. Lawson to withdraw as counsel, appointed Ben M. Swift to assume the representation of the Defendant;
 {¶ 48} "(3) Attorney Swift filed a Supplemental Motion to Suppress Evidence. The hearing on this motion was continued six times at the request of Defense counsel and finally a hearing was held on June 13, 2003. The Court issued a Decision, Order and Entry overruling the Defendant's motion on June 17, 2003;
 {¶ 49} "(4) The Defendant's then attorney, Ben Swift, filed an additional motion to suppress evidence seized as a result of a search warrant. This new motion to suppress was set for hearing on August 15, 2003. However, prior to the hearing date, Defendant retained Attorney Derrick A. Farmer, who was substituted in place of court appointed Attorney Ben Swift on July 31, 2003. Mr. Farmer, immediately upon his appointment, moved the Court for an Order continuing the motion for suppression hearing set for August 15, 2003. The case was set back on the Court's docket for a scheduling conference on August 26, 2003. At the scheduling conference a date of December 12, 2003 was selected which fit in the defense counsel's calendar. The motion to suppress date was then continued several more times at the request of the defense attorney, and finally on January 9, 2004, Defendant appeared in open court with his attorney and withdrew his last motion to suppress. The case was then set for a jury trial on April 5, 2004;
 {¶ 50} "(5) The record in this case indicates that the Defendant was initially represented by retained counsel Kenneth Lawson, who withdrew because of not receiving his retainer, he next was represented by court appointed counsel who was later replaced by Defendant's present retained counsel Derrick A. Farmer;
 {¶ 51} "(6) The trial date of April 5, 2004 was coordinated with Defendant's counsel to fit in his calendar approximately three months ago and was set as a `must go date';
 {¶ 52} "(7) Defense counsel now wants to continue the trial date, not for a change of counsel, but to add additional counsel, whose schedule conflicts with the trial date. The new additional counsel being Defendant's originally retained counsel;
 {¶ 53} "(8) The Defendant is presently in Federal Custody, having been convicted of a federal criminal offense during the pendency of this case and is awaiting sentencing by the United States District Court.
 {¶ 54} "The Court recognizes the right of the Defendant to retain counsel of his choice. In fact that is what the Defendant has done in this case. He has retained Attorney Derrick Farmer and there is no necessity to continue the case because of any conflict with Mr. Farmer's schedule. The trial date having been coordinated with his trial calendar. This is not a situation where the Defendant is attempting to retain counsel to replace court appointed counsel or to replace counsel who he has retained. The Court has provided the Defendant with fair and reasonable opportunity to retain counsel of his choice. An adequate counsel has been obtained. The question before the Court is whether the Court will grant a continuance to obtainadditional counsel when the additional counsel knew that the trial date did not fit within his schedule.
 {¶ 55} ". . . .
 {¶ 56} "The Court, having reviewed the record in this matter, finds that this case is one of the oldest cases on the Court's docket, that the State has subpoenaed in nine witnesses for trial, that retained defense counsel has had over three months to prepare for trial, that no evidence has been presented to the Court of any breakdown in communication or irreconcilable conflict with Defendant's present counsel, and there is a public interest in prompt and efficient administration of justice. Therefore, Defendant's Motion is not well taken."
 {¶ 57} (Emphasis in original.)
 {¶ 58} We have reviewed the record, and we conclude that the record supports the trial court's findings. Under the circumstances, as noted by the trial court in the above-quoted portion of its decision, we find no abuse of discretion in the trial court's decision to deny the motion Miller filed, one week before a trial date that had been set three months earlier, for a continuance of the trial date. Miller's Third Assignment of Error is overruled.
 V {¶ 59} All of Miller's assignments of error having been overruled, the judgment of the trial court is Affirmed.
Brogan, P.J., and Donovan, J., concur.