OPINION
{¶ 1} Gerald Page entered a no contest plea to drug abuse, a third degree misdemeanor, and was found guilty. The trial court imposed and suspended a sixty-day sentence and $100.00 fine and sentenced Page to one year of community control.
 {¶ 2} On appeal, Page advances a single assignment of error which implicates the *Page 2 
overruling of his motion to suppress evidence.
 {¶ 3} "THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO SUPPRESS AS THERE WAS NEITHER REASONABLE SUSPICION NOR PROBABLE CAUSE TO DETAIN AND SEARCH MR. PAGE."
 I. {¶ 4} The trial court's summarization of the facts finds ample support in the suppression hearing transcript and we reproduce it here. We will supplement the trial court's summarization as necessary in our discussion of the assignment of error. The court summarized the facts as follows:
 {¶ 5} "At the Hearing, Deputy Sheriff Burke testified that on January 11, 2006, around 10:30 A.M., he was in uniform and on RTA detail near the intersection of Fourth and Main. He and his partner, Deputy Crosby, had been observing Mr. Perkins, a known drug dealer, speaking to people passing by. Deputy Burke saw Defendant Page approach Perkins and then both looked around for police. Perkins sat on the bus stop bench and Defendant was standing. Perkins pulled out an object that appeared to be crack cocaine and started manipulating it. When the Deputies approached, Perkins threw the obj ect. On cross-examination, Deputy Burke stated that he did not see Defendant obtain drugs.
 {¶ 6} "Deputy Sheriff Crosby testified that he observed Defendant Page briefly speak to Perkins, a known narcotics dealer. Perkins was also trespassing on RTA property. The Deputy then saw Perkins sit on a bench and Defendant stand about a foot in front of him. He noticed Perkins manipulating something in his hand. He saw Perkins and Defendant looking for police and approached them. Perkins tossed something out of his right hand onto the ground. Perkins and the Defendant were secured in cuffs and a pat-down search for weapons was done for officer safety. The *Page 3 
Deputy felt a hard object in Defendant's pocket, which he knew was a crack pipe. He asked Defendant what it was and Defendant told him it was a cigarette. Deputy Crosby retrieved the item from Defendant's pocket and placed him under arrest for drug paraphernalia. After Defendant was taken to the jail, another pipe and a white pill was recovered.
 {¶ 7} "During cross-examination, Deputy Crosby testified that he was on duty at that corner because it was a known location for drugs. He had arrested Perkins four times for dealing drugs and saw Perkins approach Defendant stealthily and have a brief conversation. When Deputy Crosby made contact with Defendant, he immediately secured him for safety purposes because guns are associated with narcotics. Deputy Crosby asked Defendant's permission to search him and Defendant said `No.' Defendant was secured in cuffs and a pat-down search was done. The Deputy stated that it is their policy to detain a defendant in cuffs and do a pat-down search for officer safety. The object in Defendant's pocket was around four or five inches long. The Deputy knew from prior experience that the object felt like a crack pipe."
 {¶ 8} In overruling the motion to suppress, the court analyzed the evidence as follows:
 {¶ 9} "The Court finds that there was a reasonable suspicion of criminal activity justifying an investigatory stop of Defendant. The Deputies observed Defendant in the company of a known drug dealer in the area known for drug transactions and they witnessed activity between the drug dealer and Defendant that they believed, based on their previous experience, to be a drug transaction in progress. Because the investigatory stop was in a high drug area, a pat-down search is allowed for weapons. When the Deputy conducting the pat-down search of Defendant felt the hard object in Defendant's pocket, he knew it was a crack pipe. The pipe can be seized because it was immediately apparent to the Deputy that it was illegal contraband." *Page 4 
 II. {¶ 10} Page argues on appeal that there was no justification for stopping him or frisking him, and that the crack pipe, for the possession of which he was arrested, was unlawfully seized.
 {¶ 11} Based upon the facts as related above, we are satisfied that the arresting officers possessed a reasonable, articulable suspicion that Page had been involved in a drug transaction with Perkins, so as to justify a legitimate investigative detention. See Terry v. Ohio (1968),392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889. Assuming that aTerry frisk was justified, we would conclude that the trial court reasonably held that the crack pipe was properly seized pursuant to the plain feel doctrine enunciated in Minnesota v. Dickerson (1993),508 U.S. 366, 375-76, 113 S.Ct. 2130, 124 L.Ed.2d 334.
 {¶ 12} We are constrained to conclude, however, that the frisk conducted in this case was not a legitimate Terry patdown. The direct and cross-examination testimony of Deputy Crosby, who performed the patdown on Page, compels this conclusion.
 {¶ 13} Direct examination:
 {¶ 14} "Q: OK and can you describe what happened when you got close enough to have some conversation with these two men?
 {¶ 15} "A: Mr. Perkins tossed something out of his right hand onto the ground. My partner made contact with him. I made contact with Page-
 {¶ 16} "Q. Why don't you describe the contact you had then with Mr. Page.
 {¶ 17} "A. I made contact with Page. We secured both subjects in handcuffs for our safety. We advised them they were being detained. We told them the reason why we detained them. I asked Mr. Page for consent to search him, which he said no. Myself, fearing that he might have a weapon *Page 5 
or anything, I performed a Terry pat down search on him.
 {¶ 18} "* * *
 {¶ 19} "Q. OK your pat down of Mr. Page was done to for your own safety, is that correct?
 {¶ 20} "A. Yes every — he was in handcuffs. We always handcuff first, do pat down second, and or search second. * * *."
 {¶ 21} Cross examination:
 {¶ 22} "Q. No. And you said that you immediately made contact with Mr. Page, this is what you stated for the record.
 {¶ 23} "A. Yes.
 {¶ 24} "Q. And then you pretty much immediately secured him for your safety, is that correct?
 {¶ 25} "A. Yes ma'am.
 {¶ 26} "Q. Was Mr. Page — he wasn't expecting you so was he, was he violent when you approached him?
 {¶ 27} "A. No.
 {¶ 28} "Q. Was he screaming?
 {¶ 29} "A. No.
 {¶ 30} "Q. Did he pull out a gun?
 {¶ 31} "A. No.
 {¶ 32} "Q. Did he wave his hand or fist at you in any way?
 {¶ 33} "A. No ma'am.
 {¶ 34} "Q. Um did he say anything insulting? *Page 6 
 {¶ 35} "A. No.
 {¶ 36} "Q. Did he, I don't know, did he commit any kind of act that would give you reason any kind of reason to fear him at that point?
 {¶ 37} "A. No we don't have to have a reason to detain subjects.
 {¶ 38} "Q. OK um so you basically just detain them because you wanted to be on the safe side, is that correct?
 {¶ 39} "A. Yes ma'am.
 {¶ 40} "Q. OK-
 {¶ 41} "A. I associate narcotics with guns like guns with narcotics.
 {¶ 42} "* * *
 {¶ 43} "Q. All right so while you saw my client have a conversation with someone that you suspected of committing a crime etcetera and you came up to him and after just observing him have a conversation and placing him into handcuffs for your own safety um you then asked my client permission to search him, is that not correct?
 {¶ 44} "A. Uh huh.
 {¶ 45} "Q. And my client said no?
 {¶ 46} "A. Yes, he said no.
 {¶ 47} "Q. OK but then you went ahead and conducted a pat down anyhow?
 {¶ 48} "A. Yes.
 {¶ 49} "Q. Based on what?
 {¶ 50} "A. To — well we had detained him for the suspicious circumstance with the behavior and everybody that we detain we always pat down for weapons. *Page 7 
 {¶ 51} "Q. You always pat down for weapons.
 {¶ 52} "A. Uh huh.
 {¶ 53} "Q. Because you were concerned about your safety?
 {¶ 54} "A. Yes I patted him down for our safety. We don't know if he's concealing a weapon or not.
 {¶ 55} "Q. OK, but he hadn't given you any indication to be afraid in the first place.
 {¶ 56} "A. They don't — we don't, they don't have to.
 {¶ 57} "Q. Right and that is what you stated.
 {¶ 58} "A. Uh huh.
 {¶ 59} "Q. And then you placed him in handcuffs although you didn't have any indication that he was a threat and then after you asked to search him you asked if you could search him, correct?
 {¶ 60} "A. Uh huh.
 {¶ 61} "Q. At that point he was handcuffed already.
 {¶ 62} "THE STATE: Your Honor I'm going to obj ect, that's about six questions. She's not letting him answer.
 {¶ 63} "Q. I apologize um-
 {¶ 64} "A. First he was — I'll answer your question. First he was detained by the handcuff, which is our policies and procedures-
 {¶ 65} "Q. Uh huh.
 {¶ 66} "A. Then when consent was asked, he said no, but we can legally perform a Terry pat down on any subject we come in contact with whether they're handcuffed or not. *Page 8 
 {¶ 67} "Q. OK.
 {¶ 68} "A. He could not have been handcuffed and I could have said well I'm going to pat you down for my safety and then perform aTerry pat down on him.
 {¶ 69} "Q. OK and you did the Terry pat down because you were concerned for your safety?
 {¶ 70} "A. Yes.
 {¶ 71} "Q. Of this person that had given you no indication that he presented any kind of threat?
 {¶ 72} "A. I don't know that though. That's why I have to do aTerry pat down on everybody I come in contact with.
 {¶ 73} "Q. You do a Perry [sic] — everyone you — could I get it straight — everyone you come in contact with you would do aTerry pat down with, is that what-
 {¶ 74} "A: When we have a suspicious circumstance and we've observed what we believe to be a narcotics violation, then at that point we would definitely secure that person and do a-
 {¶ 75} "Q. Secure that person-
 {¶ 76} "A: Terry pat down.
 {¶ 77} "Q. Terry pat down. OK um, just one moment, he was handcuffed at the time, correct?
 {¶ 78} "A. Yes.
 {¶ 79} "Q. Was he threatening at that point in time?
 {¶ 80} "A. No, no ma'am."
 {¶ 81} In State v. Evans, 67 Ohio St.3d 405, 1993-Ohio-186,618 N.E.2d 162, Chief Justice Moyer, writing for a 4 — 3 majority, stated: "The right to frisk is virtually automatic when individuals *Page 9 
are suspected of committing a crime, like drug trafficking, for which they are likely to be armed." Id. at 413.
 {¶ 82} The State seizes upon this statement and argues that because the arresting officers reasonably suspected Page was involved with Perkins in a drug transaction, "associated guns and narcotics and feared (Perkins) might be armed," Crosby was justified in subjecting Page to aTerry patdown.
 {¶ 83} We disagree.
 {¶ 84} The Chief Justice's statement in Evans cannot be utilized to justify a Terry patdown whenever a person is suspected of involvement in a drug transaction. To do so is to do violence to Terry, which the Chief Justice expressly said dictated whether a patdown search for weapons was legitimate. Evans, 67 Ohio St.3d at 408. Quoting from Terry, he stated that "a limited protective search of the detainee's person for concealed weapons is justified only when the officer has reasonably concluded that `the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others * * *.'" Id.
 {¶ 85} It is thus clear even from the majority opinion inEvans that a frisk for weapons cannot be justified merely because an investigative stop for suspected drug dealing is legitimate underTerry.
 {¶ 86} Here, we can only conclude that the arresting officers must have believed that a proper investigative stop legitimized, without more, a frisk for weapons.
 {¶ 87} While the officers appear to have been justified in detaining Perkins and Page to investigate their suspicious behavior,Terry, 392 U.S. at 22, we perceive no basis from our review for a frisk for weapons. The officers pointed to nothing that would support a reasonable suspicion that *Page 10 
Page was armed and dangerous. Indeed, their policy seemed to be to ask no questions upon approaching a suspect but, rather, to immediately handcuff the suspect and frisk him. Deputy Crosby's generalization associating narcotics with guns and saying Page might have had a weapon did not demonstrate a justifiable belief that Page was armed and presently dangerous. Id. at 24.
 {¶ 88} Because the frisk was unjustified, the seizure of the crack pipe was unlawful and Page's arrest on account of possessing the pipe was likewise unlawful. The crack pipe and the additional contraband seized after the arrest should have been suppressed.
 III. {¶ 89} The assignment of error is sustained.
 {¶ 90} The judgment will be reversed and the matter will be remanded for further proceedings not inconsistent with this opinion.