DECISION. *Page 2 
{¶ 1} Following a jury trial, defendant-appellant, Stanley Foster, was convicted of robbing a convenience store. Foster now appeals.
 The Robbery {¶ 2} Steven Blount and Foster's younger brother, Andre, waited in a parked car while Foster went in to rob the Bridgetown Mini Mart. David Jackson, a customer, was entering the store when he noticed them. Jackson testified that he saw a black man leaning into the car, an older model, and had assumed that "some sort of drug deal" was going on.
 {¶ 3} Jackson entered the store. As he made his purchases at the store counter, he noticed that the same man who had been leaning into the car was standing in line behind him. That man was Foster.
 {¶ 4} At that time, Kanu Patel was working at the store with his wife. Patel was talking on a speaker phone to his cousin Umash Patel, who was at another store. The two were talking in their native language, Gujarati, a language spoken in a region of India.
 {¶ 5} Foster waited in line behind Jackson, and then, as Jackson left the store, he asked Patel for a pack of Newport cigarettes. Patel put the pack on the counter. Foster pulled out a gun and fired a shot that just missed Patel, and he demanded money.
 {¶ 6} Patel's wife stopped vacuuming and asked what was happening. In Gujarati, Patel told her that they were being robbed and that she should put her hands *Page 3 
up. Through the telephone, Umash heard Patel's statement to his wife and immediately called the police to report the robbery.
 {¶ 7} For one of the store's regular customers, Patel had kept a handwritten account of the customer's purchases and amounts owed. Patel had written the account in Gujarati on a piece of thin cardboard cut to the shape of a dollar bill and kept the account in the cash register's slot for $50 and $100 bills. So when Foster emptied the register drawers of cash and stuffed it into his pants pockets, he unwittingly took with the money Patel's handwritten account slip.
 {¶ 8} Jackson, who had been walking away from the store when he heard the gunshot, called the police. He reported that he had heard a gunshot and thought that the store had just been robbed. Jackson said that he had seen a black man wearing a beanie hat who had been "standing by like a Cadillac or something" before the man had entered the store. Jackson described the car as an older brown or tan Cadillac.
 {¶ 9} Blount testified that when Foster came out and got back into the car, they drove off. He saw Foster put a revolver into the glove compartment.
 {¶ 10} Immediately, police radio broadcasts indicated that a gun had just been fired in a robbery of the store and that the robbery suspect was a black male wearing a beanie who had been "standing next to an older brown Cadillac before he went into the store."
 {¶ 11} As soon as he received the initial broadcast, Hamilton County Sheriff's Deputy Daniel Sherman sped in his patrol car toward the store. Almost instantly, he noticed an "older style possibly brown Cadillac" driving toward him, from the direction of the store. Sherman turned his car around to follow it. *Page 4 
 {¶ 12} Sherman radioed to the dispatcher, "I just turned around on an older Cadillac, I'm going northbound on Race [Road]. * * * They didn't get a better description?" He immediately recognized that the car was not a Cadillac and radioed that he was following a 1984 Oldsmobile occupied by three black men. For safety reasons, Sherman waited to pull the car over until other officers had arrived.
 {¶ 13} Within moments, other officers approached, so Sherman activated his overhead lights and pulled the car over.
 {¶ 14} Meanwhile, Green Township Police Officer Tim Icenogle had gone into the Bridgetown Mini Mart. Icenogle testified that Patel was upset and visibly shaken, and that he could not understand Patel's limited English. Patel made a gun gesture with his hand and then pointed up to the store's video camera. Icenogle reviewed the videotape of the robbery and radioed a further description of the robbery suspect to the police dispatcher.
 {¶ 15} Officers at the scene of the stopped Oldsmobile removed Blount and Andre from the car and patted them down. Neither of them was carrying a gun.
 {¶ 16} When a further police broadcast described the robbery suspect as a black male wearing a black knit cap, a gray T-shirt, and a black, possibly leather, jacket, the officers realized that the car's front passenger, Foster, matched the description. Foster was wearing a gray T-shirt and dark pants, and was sitting on a black leather jacket. And as Foster was taken from the car, officers noticed a black knit cap lying between his feet.
 {¶ 17} Green Township Police Officer Patrick Young patted Foster down. He noticed four large bulges in the front and rear pockets of Foster's jeans. Because he was unable to determine what was inside the pockets, and because he knew that a gun had *Page 5 
been involved in the robbery, Young was concerned for his safety. So Young reached into Foster's pockets and discovered large wads of cash in each one.
 {¶ 18} In the stacks of cash, which totaled $2,770, police discovered the account slip that Patel had handwritten in his native language.
 {¶ 19} After Foster had been secured in a police car, police found a .22-caliber revolver in the Oldsmobile's glove compartment. The revolver contained four live rounds of ammunition and two empty shell casings.
 {¶ 20} Testing revealed gunshot residue on Foster's hands. No gunshot residue was found on Andre's or Blount's hands.
 {¶ 21} The black leather jacket that Foster had been sitting on was swabbed, and testing revealed the presence of his DNA, not that of his brother or of Blount. Three packs of Newport cigarettes were in the jacket's pockets.
 {¶ 22} Hamilton County Sheriff's Deputy Jeremy DePaoli transported Foster back to the store parking lot and had Foster stand outside the police car, about 35 feet from the store's door. Then Icenogle walked from the parking lot to the store and motioned for Patel to come over to the door. Patel walked to the door, looked out toward the lighted parking lot, and nodded his head.
 The Trial and Sentence {¶ 23} A jury found Foster guilty of aggravated robbery, robbery, and having a weapon while under a disability. The trial court sentenced him to consecutive prison terms of ten years for the aggravated robbery, eight years for the robbery, and five years for the weapon-under-disability charge. In addition, the trial court imposed a three-year prison term for an underlying firearm specification. The aggregate prison term was 26 years. *Page 6 
 Assignments of Error {¶ 24} In five assignments of error, Foster challenges (1) the trial court's failure to dismiss the indictment on speedy-trial grounds, (2) the overruling of his motion to suppress evidence, (3) structural error caused by a defective indictment, (4) the weight and sufficiency of the evidence, and (5) the separate sentences for both aggravated robbery and robbery based on the same conduct. We address the assignments of error out of order.
 Sentencing {¶ 25} In his fifth assignment of error, Foster argues that aggravated robbery under R.C. 2911.01(A)(1) and robbery under R.C. 2911.02(A)(2) are allied offenses of similar import, and that, as a result, the trial court erred by sentencing him separately for robbery.
 {¶ 26} In State v. Madaris, [1] this court held that those two offenses are allied offenses of similar import.[2] And because the offenses in this case were committed with a single animus, the trial court erred in imposing sentences for both.[3] Accordingly, we sustain the fifth assignment of error.
 Defective Indictment {¶ 27} In his third assignment of error, Foster challenges the indictment as defective because it failed to state the requisite mens rea required for the commission of *Page 7 
the offenses of aggravated robbery and robbery. Foster failed to object to the terms of the indictment.
 {¶ 28} Because we have held that the trial court erred by sentencing Foster for robbery, there was no prejudice in the finding of guilt for that offense.
 {¶ 29} In State v. Colon (Colon I), [4] the Ohio Supreme Court held that the omission of a mens rea allegation in the indictment was a structural defect that rendered the conviction improper.[5] But inState v. Colon (Colon II), [6] the court limited the holding inColon I to its specific facts, noting that the application of a structural-error analysis to a defective indictment would rarely be appropriate.[7]
 {¶ 30} If a defect in the indictment did not create multiple errors that permeated the proceedings and the defendant failed to object to the alleged defect, an appellate court is to review the proceedings for plain error.[8] Under the plain-error standard, an appellate court will reverse a judgment only where the outcome clearly would have been different absent the alleged error.[9]
 {¶ 31} In this case, the absence of mens rea allegations in the indictment did not result in multiple errors, and the trial court did not commit plain error in convicting Foster of aggravated robbery. The state presented evidence that Foster had committed aggravated robbery purposely, a greater degree of culpability than the recklessness required for robbery by the holding in Colon I.[10] Moreover, unlike the jury in Colon I, [11] the jury in this case was not informed that aggravated robbery was a strict-liability *Page 8 
offense. Under these circumstances, any defects in the indictment were harmless, and we overrule the third assignment of error.
 Weight and Sufficiency {¶ 32} In his fourth assignment of error, Foster argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.
 {¶ 33} In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt.[12] In reviewing a challenge to the weight of the evidence, we must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[13]
 {¶ 34} To find Foster guilty of aggravated robbery in violation of R.C. 2911.01(A)(1), the jury had to find that, in attempting or committing a theft offense, or in fleeing immediately thereafter, he had a deadly weapon on his person or under his control and had either displayed, brandished, indicated possession of, or used the weapon. To find Foster guilty of having a weapon while under a disability in violation of R.C. 2923.13(A)(2), the jury had to find that he had knowingly acquired, had, carried, or used a firearm and had been convicted of a felony offense of violence.[14] *Page 9 
 {¶ 35} The overwhelming evidence of Foster's guilt included the videotape of him robbing the store, as well as his immediate apprehension that resulted in the discovery of wads of cash in his pockets. Unfortunately for Foster, Patel's handwritten Gujarati-language note that had been in the cash register was recovered within those wads of cash. A revolver with two spent shell casings was recovered from the glove compartment where Foster had stowed it. Foster had gunshot residue on his hands. In addition, the state presented incriminating testimony from Foster's brother, Andre, and from Blount
 {¶ 36} We hold that a rational juror, viewing the evidence in the light most favorable to the state, could have found that the state had proved beyond a reasonable doubt that Foster had committed the offenses of aggravated robbery and of having a weapon while under a disability. Therefore, the evidence was legally sufficient to sustain Foster's convictions.
 {¶ 37} Although Foster claims that the evidence did not support his being the perpetrator of the crimes, the weight to be given the evidence and the credibility of the witnesses were primarily for the jury to determine.[15] Moreover, our review of the record does not persuade us that the jury clearly lost its way and created a manifest miscarriage of justice in finding Foster guilty of the offenses. Accordingly, we overrule the fourth assignment of error.
 Speedy Trial {¶ 38} In his first assignment of error, Foster argues that the trial court erred by overruling his motion to dismiss the indictment on speedy-trial grounds. *Page 10 
 {¶ 39} A criminal defendant's right to a speedy trial is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, Section 10 of the Ohio Constitution.[16]
R.C. 2945.71 through 2945.73 set forth the time within which a defendant must be brought to trial.
 {¶ 40} A person charged with a felony must be brought to trial within 270 days of his arrest.[17] Each day that the defendant is held in jail in lieu of bail must be counted as three days.[18] Failure to bring the defendant to trial within the proper time requires that the felony charge against him be dismissed and that he be discharged from further prosecution for the offense. [19]
 {¶ 41} Speedy-trial time may be extended only for the reasons set forth in R.C. 2945.72(A) through (I). In particular, R.C. 2945.72 (H) provides that speedy-trial time may be tolled for "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion."
 {¶ 42} "Reasonable" delays sought by the state are not chargeable to the state.[20] The reasonableness of a continuance is determined by examining the purpose and the length of the continuance as specified in the record.[21] *Page 11 
 I. Continuance Requested by the State {¶ 43} In this case, Foster argues that he was not brought to trial within 270 days of his arrest. Instead, Foster contends that, for purposes of the statutory speedy-trial calculation, 281 days had passed between his arrest and trial.
 {¶ 44} In particular, the parties dispute whether a 35-day period triggered by the state's request for a continuance tolled the running of the speedy-trial clock. Due to the triple-count provision of R.C. 2945.71(E), this 35-day period must be calculated as 105 days.
 {¶ 45} On June 13, 2007, the trial court scheduled a hearing on Foster's motion to suppress for July 26, 2007. The parties do not dispute that the 43-day period from July 13 to July 26, 2007, was attributable to Foster and extended the speedy-trial time. Then, on what was to be the suppression-hearing date, the state requested a continuance so that it could have more time to prepare for the hearing. The court continued the case for 35 days, until August 30, 2007.
 {¶ 46} In its brief on appeal, the state contends that this delay was reasonable and therefore not chargeable to the state under R.C. 2945.72(H). The state argues that the suppression hearing had not been a simple one and that it had involved seven witnesses.
 {¶ 47} But the state does not explain why it had needed more time to prepare for the hearing. The mere fact that it had required the testimony of seven witnesses does not explain why the state needed five weeks, in addition to the preceding six weeks, to prepare. Aside from the number of witnesses, the state does not explain what made this particular hearing more than a "simple" one. *Page 12 
 {¶ 48} Accordingly, we hold that the continuance granted upon the state's request did not toll the running of Foster's speedy-trial time because, on this record, we cannot say that the 35-day delay was either necessary or reasonable.
 II. Continuance Requested by the Defendant {¶ 49} If our analysis were to end here, we would have to agree with Foster that the speedy-trial time in his case had exceeded 270 days. But our review of the record convinces us otherwise.
 {¶ 50} Inexplicably, the state does not dispute Foster's contention that a 48-day period from October 23, 2007, to December 10, 2007, [22]
was chargeable to the state. Each of those days must be counted as three days because Foster was in jail, for a total of 144 days.[23] But the record reflects that Foster, not the state, had requested the continuance.
 {¶ 51} The court's continuance entry created some confusion, even for appellate counsel. The entry stated that the case had been continued at Foster's request. Under that line, another line indicated a "No" selection next to "Waive time," presumably to suggest that Foster had not waived his speedy-trial time for the period. So on appeal, Foster and the state both count this delay against the state for purposes of speedy-trial time. Both are wrong.
 {¶ 52} Tolling occurs by operation of the statute, regardless of whether a waiver has been executed.[24] When the court granted Foster's motion for a continuance, his *Page 13 
speedy-trial time was automatically extended pursuant to R.C. 2945.72(H). So the 144-day delay triggered by Foster's continuance request was not chargeable to the state. Foster's trial occurred well within the speedy-trial limits of R.C. 2745.71. Therefore, we overrule the first assignment of error.
 Motion to Suppress {¶ 53} In his second assignment of error, Foster argues that the trial court erred by failing to grant his motion to suppress. Foster challenges the stop of the car he was traveling in, the pat-down and search of his clothing, and the one-on-one identification procedure.
 I. The Stop {¶ 54} First, Foster contends that the stop of the car was improper because the broadcast had described "an older brown Cadillac," whereas he had been in an Oldsmobile. He also argues that Deputy Sherman could not have seen the car's make or model because it had been dark and rainy, and that "the vehicle was not brown, but more of a dark beige or champagne color."
 {¶ 55} An investigatory stop of a car is lawful under theFourth Amendment where an officer has a reasonable, articulable suspicion that a motorist is or has recently been engaged in illegal activity. [25]
The propriety of an investigatory stop by a police officer must be viewed in light of the totality of the surrounding circumstances.[26] *Page 14 
 {¶ 56} Deputy Sherman testified that he saw a "larger square style vehicle" driving away from the area of the crime. He said the car, a brownish Oldsmobile, had a similar body style to a Cadillac. He stated, "If you would look at the two cars in comparison with those [model] years, they looked identically similar." Moreover, Sherman knew from the broadcast that a black male was suspected in the robbery. And the car he followed had three black male occupants.
 {¶ 57} Under these circumstances, we hold that the stop of the Oldsmobile was based upon a reasonable, articulable suspicion that one of its occupants had been involved in an aggravated robbery.
 II. The Pat-down {¶ 58} Foster also claims that the trial court erred by denying his motion to suppress because the pat-down search was improper. We disagree.
 {¶ 59} Terry v. Ohio[27] authorizes a limited protective search of a detained person for concealed weapons when a police officer has a reasonable suspicion, based on the totality of the circumstances, that the person is armed and dangerous. A pat-down search "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby."[28]
 {¶ 60} In State v. Evans, [29] the Ohio Supreme Court held that if in conducting a lawful pat-down search for weapons, an officer discovers an object on the suspect's person that the officer, through his or her sense of touch, reasonably believes could be a weapon, the officer may seize the object[30] In that case, during a pat-down, an *Page 15 
officer felt an object in the suspect's pocket and was unable to conclude that the object was not a knife or other weapon. The officer retrieved from the suspect's pocket what turned out to be a large wad of money and a small packet of crack cocaine. The court held that, because the object was of such size and density that a reasonable officer could not discount the possibility that it was a weapon, the search did not violate Terry.[31]
 {¶ 61} In this case, Officer Young's pat-down search of Foster was clearly justified. Young knew that a robber had fired a gun during a store robbery and that Foster, who had been stopped within minutes of the robbery in the suspected getaway car, matched the description of the armed robber. Moreover, no gun had been found on either of the car's other occupants. So Young's fear for his own safety and for that of his fellow officers was more than reasonable. And where Young could not be sure whether the items producing the bulges were weapons, it was proper for him to retrieve them.
 III. The One-on-One Identification {¶ 62} Foster argues that the court should have suppressed Patel's on-scene identification because it was unnecessarily suggestive of his guilt and made the identification unreliable.
 {¶ 63} The Ohio Supreme Court has noted that "[t]here is no prohibition against a viewing of a suspect alone in what is called a `one-man showup' when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circumstances to insure *Page 16 
accuracy. * * * [P]olice action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh."[32]
 {¶ 64} So while the procedure used in this case may have been suggestive, it was not unfairly suggestive of Foster's guilt. He had been apprehended within minutes of the robbery and matched the description of the robber, he was riding in a car that matched the description of the getaway car, a revolver had been found in the car's glove compartment directly in front of where he sat, and his pockets were stuffed full of cash.
 {¶ 65} Having found that the procedure was not unduly suggestive, we need not address the reliability of the identification. We overrule the second assignment of error.
 Conclusion {¶ 66} We hereby vacate the sentence for robbery. In all other respects, the judgment of the trial court is affirmed.
Judgment accordingly.
SUNDERMANN and CUNNINGHAM, JJ., concur.
[1] 1st Dist. No. C-070287, 2008-Ohio-2470.
[2] Id. at ¶ 3.
[3] See R.C. 2941.25.
[4] 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917.
[5] Id. at ¶ 38.
[6] 119 Ohio St.3d 204, 2008-Ohio-3749, 893 N.E.2d 169.
[7] Id. at ¶ 8.
[8] Id. at ¶ 7.
[9] State v. Miller, 1st Dist. No. C-070691, 2008-Ohio-5899, ¶ 22.
[10] Colon I, supra, at ¶ 14.
[11] Id. at ¶ 31.
[12] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[13] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[14] At trial, Foster stipulated that he had previously been convicted of aggravated robbery, a felony offense of violence.
[15] See State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
[16] Klopfer v. N. Carolina (1967), 386 U.S. 213, 87 S.Ct. 988;State v. Ladd (1978), 56 Ohio St.2d 197, 383 N.E.2d 579.
[17] R.C. 2945.71(C)(2).
[18] R.C. 2945.71(E).
[19] R.C. 2945.73(B).
[20] R.C. 2945.72(H).
[21] State v. Myers, 97 Ohio St.3d 335, 2002-Ohio-6658,780 N.E.2d 186.
[22] In their briefs on appeal, both parties calculate this as a 44-day period ending on December 6, 2007, but the record plainly reflects the extension to have lasted until December 10, 2007, four days later.
[23] Contrary to the calculations by the state and by Foster, the period must be counted as 144 days, not 132 days.
[24] State v. Blackburn, 118 Ohio St.3d 163, 2008-Ohio-1823,887 N.E.2d 319, at ¶ 18.
[25] See Delaware v. Prouse (1979), 440 U.S. 648, 99 S.Ct. 1391;Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868.
[26] State v. Freeman (1980), 64 Ohio St.2d 291, 414 N.E.2d 1044, paragraph one of the syllabus.
[27] See Terry, supra.
[28] Terry, supra, at 26.
[29] 67 Ohio St.3d 405, 1993-Ohio-186, 618 N.E.2d 162.
[30] Id. at paragraph two of the syllabus.
[31] Id. at 415.
[32] See State v. Madison (1980), 64 Ohio St.2d 322, 332,415 N.E.2d 272, quoting Bates v. United States (C.A.D.C. 1968), 405 F.2d 1104, 1006. *Page 1